[No. D039485. Fourth Dist., Div. One. Mar. 27, 2003.]

THE PEOPLE ex rel. BILL LOCKYER, as Attorney General, etc.,
Plaintiff and Respondent, v.
R.J. REYNOLDS TOBACCO COMPANY, Defendant and Appellant.

518

COUNSEL

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, H. Joseph Escher III, Ethan P. Schulman, Pamela T. Johann and Evan S. Nadel for Defendant and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Dennis Eckhart, Assistant Attorney General, Amy J. Hertz, Michelle Fogliani and Peter Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Milberg Weiss Bershad Hynes & Lerach, Patrick J. Coughlin, Frank J. Janecek, Jr., Christopher Collins; and Matthew L. Myers for the American Cancer Society, the American Lung Association, the American Heart Association, the American Public Health Association, the American Academy of Family Physicians, the American College of Chest Physicians and the National Center for Tobacco-Free Kids, Inc., as Amici Curiae on behalf of Plaintiff and Respondent.

Janet Napolitano, Attorney General (Arizona) and Craig W. Soland, Assistant Attorney General, for State Attorneys General as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**KREMER, P. J.**—Defendant R.J. Reynolds Tobacco Company (Reynolds) appeals a summary judgment favoring plaintiff the People of the State of California on the People's complaint for enforcement of a master settlement agreement (MSA). Reynolds contends the court erred in concluding Reynolds violated an MSA provision limiting outdoor advertising of tobacco

products. Since Reynolds has not demonstrated reversible error, the summary judgment must be upheld.

I

INTRODUCTION

We review the summary judgment de novo. (*Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 235 [114 Cal.Rptr.2d 151].) ▇ Further, the "interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence." (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843 [102 Cal.Rptr.2d 468]; *Centex Golden Construction Co. v. Dale Tile Co.* (2000) 78 Cal.App.4th 992, 996 [93 Cal.Rptr.2d 259].)[1]

Tobacco product manufacturer Reynolds promoted its tobacco products in California.[2] As part of Reynolds's promotion of its Winston brand of cigarettes, Reynolds sponsored the NASCAR[3] Winston Cup Series, a series of races characterized by Reynolds as a "year-long points competition" where competitors in various venues in the United States vied for points needed to win awards. Events comprising a portion of the Reynolds-sponsored NASCAR Winston Cup Series were held at the Sears Point Raceway (Sears Point) in Northern California.[4]

In November 1998 Reynolds and the People signed the MSA that settled the People's litigation against various tobacco product manufacturers, including Reynolds.[5] Further, the parties stipulated to entry of a consent decree and final judgment. As part of the consent decree, the Superior Court of San Diego County approved the MSA (*People v. Philip Morris, Inc.* (1998, No. JCCP4041)). The court also retained exclusive jurisdiction for purposes of implementing and enforcing the MSA.

The MSA placed various detailed express restrictions on Reynolds's advertising and marketing practices. However, despite generally banning all

---

[1]The MSA's subsection XVIII(f) provided in relevant part that "no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose."

[2]The MSA's subsection II(vv) defined " 'Tobacco Products' " as "Cigarettes and smokeless tobacco products."

[3]The National Association for Stock Car Auto Racing, Inc.

[4]Also held in California were events comprising the NASCAR Winston West Series and the Winston Drag Racing Series of the National Hot Rod Association. Those events are not directly at issue on this appeal.

[5]Other states and other tobacco product manufacturers were also signatories to the MSA.

billboard and other outdoor advertising of tobacco products, the MSA expressly permitted Reynolds to continue to promote and advertise its NASCAR Winston Cup Series as a "Brand Name Sponsorship." Eventually, a dispute arose between the parties about whether by not removing some outdoor advertising signs mentioning Winston at Sears Point, Reynolds violated the MSA's limitation on outdoor advertising.

In March 2001 after communications between the parties failed to resolve the matter, the People brought this litigation against Reynolds to enforce the MSA and obtain relief for Reynolds's alleged violation of the MSA's restrictions on outdoor advertising. Ultimately, the superior court granted the People's motion for summary judgment against Reynolds. Reynolds appeals.

II

LANGUAGE OF THE MSA

A

*Outdoor Advertising Limited*

The MSA's subsection III(d), entitled "Elimination of Outdoor Advertising and Transit Advertisements," provided in relevant part: "Each Participating Manufacturer shall discontinue Outdoor Advertising[6] . . . advertising Tobacco Products within the Settling States as set forth herein. [¶] (1) Removal. Except as otherwise provided in this section, each Participating Manufacturer shall remove from within the Settling States within 150 days after the MSA Execution Date all of its (A) billboards (to the extent that such billboards constitute Outdoor Advertising) advertising Tobacco Products; (B) signs and placards (to the extent that such signs and placards constitute Outdoor Advertising) advertising Tobacco Products in arenas, stadiums, shopping malls and Video Game Arcades . . . . [¶] (2) Prohibition on New Outdoor Advertising and Transit Advertisements. No Participating Manufacturer may, after the MSA Execution Date, place or cause to be placed any new Outdoor Advertising advertising Tobacco Products . . . within any Settling State."

---

[6]In relevant part, the MSA's subsection II(*ii*) defined " 'Outdoor Advertising' " as "(1) billboards, (2) signs and placards in arenas, stadiums, shopping malls and Video Game Arcades (whether any of the foregoing are open air or enclosed) (but not including any such sign or placard located in an Adult-Only facility), and (3) any other advertisements placed (A) outdoors, or (B) on the inside surface of a window facing outward."

B

*Some Tobacco Brand Name Sponsorships Allowed*

(1)

*Brand Name Sponsorships Defined*

In relevant part, the MSA's subsection II(j) defined " 'Brand Name Sponsorship' " as "an athletic, musical, artistic, or other social or cultural event as to which payment is made (or other consideration is provided) in exchange for use of a Brand Name[7] or Names (1) as part of the name of the event or (2) to identify, advertise, or promote such event or an entrant, participant or team in such event in any other way. Sponsorship of a single national or multi-state series or tour (for example, NASCAR (including any number of NASCAR races)), or of one or more events within a single national or multi-state series or tour, or of an entrant, participant, or team taking part in events sanctioned by a single approving organization (e.g., NASCAR or CART), constitutes one Brand Name Sponsorship."

(2)

*Tobacco Brand Name Sponsorships Limited*

The MSA's subsection III(c), entitled "Limitation of Tobacco Brand Name Sponsorships," provided in relevant part: "(1) Prohibited Sponsorships. After the MSA Execution Date, no Participating Manufacturer may engage in any Brand Name Sponsorship in any State consisting of: [¶] (A) concerts; or [¶] (B) events in which the intended audience is comprised of a significant percentage of Youth; or [¶] (C) events in which any paid participants or contestants are Youth; or [¶] (D) any athletic event between opposing teams in any football, basketball, baseball, soccer or hockey league. [¶] (2) Limited Sponsorships. [¶] (A) No Participating Manufacturer may engage in more than one Brand Name Sponsorship in the States in any twelve-month period (such period measured from the date of the *initial sponsored event*). [¶] . . . [¶] (3) Related Sponsorship Restrictions. With

---

[7] The MSA's subsection II(*i*) defined " 'Brand Name' " as a "brand name (alone or in conjunction with any other word), trademark, logo, symbol, motto, selling message, recognizable pattern of colors, or any other indicia of product identification identical or similar to, or identifiable with, those used for any domestic brand of Tobacco Products. Provided, however, that the term 'Brand Name' shall not include the corporate name of any Tobacco Product Manufacturer that does not after the MSA Execution Date sell a brand of Tobacco Products in the States that includes such corporate name."

respect to any Brand Name Sponsorship permitted under this subsection (c): [¶] (A) advertising of the Brand Name Sponsorship event shall not advertise any Tobacco Product (other than by using the Brand Name to identify such Brand Name Sponsorship event); [¶] . . . [¶] (E) nothing contained in the provisions of section III(d) [eliminating most outdoor advertising] shall: . . . (ii) apply to Outdoor Advertising advertising the Brand Name Sponsorship, to the extent that such Outdoor Advertising is placed at the site of a Brand Name Sponsorship no more than 90 days before the start of the *initial sponsored event*, is removed within 10 days after the end of the *last sponsored event*, and is not prohibited by subsection (3)(A) above." (Italics added.)

## III

### DISCUSSION

Reynolds contends its advertising in California of the NASCAR Winston Cup Series complied fully with the MSA's restrictions on outdoor advertising. However, the People contend Reynolds violated the MSA's provisions involving the length of time that Reynolds's advertising signage was allowed to be posted at Sears Point. In particular, the parties dispute the meaning of the phrase "initial sponsored event" as used in the MSA's subsection III(c)(2)(A) and later in the MSA's subsection III(c)(3)(E)(ii).

Specifically, Reynolds contends that since the phrase "initial sponsored event" in the MSA's subsection III(c)(2)(A) undisputedly referred to the first event in Reynolds's Brand Name Sponsorship series in a 12-month period, the phrase "initial sponsored event" in the MSA's subsection III(c)(3)(E)(ii) should be interpreted as conveying the same meaning, to wit, that Reynolds's outdoor advertising could be placed at any site where a Brand Name Sponsorship event took place as long as such advertising was placed no more than 90 days before the first event in the Brand Name Sponsorship series as a whole and was removed no later than 10 days after the last event in the entire series. Thus, applying its proffered interpretation, Reynolds concludes the protracted schedule of the NASCAR Winston Cup Series from February to November allowed for uninterrupted signage at Sears Point.

However, though concurring in Reynolds's interpretation of the meaning of the phrase "initial sponsored event" as used in the MSA's subsection III(c)(2)(A), the People contend the phrase "initial sponsored event" as used in the MSA's subsection III(c)(3)(E)(ii) referred to the first event at each particular racetrack where a portion of the Brand Name Sponsorship series

took place. Hence, applying their proffered interpretation, the People conclude Reynolds's outdoor advertising at each of those particular sites was temporally limited to the period between 90 days before and 10 days after the events at each such respective site.

In sum, Reynolds contends the text of the MSA's subsection III(c)(3)(E)(ii) indicated that the phrases "initial sponsored event" and "last sponsored event" referred to the first and last events of Reynolds's Brand Name Sponsorship series as a whole, while the People contend those phrases referred to the first and last days of events at particular races sites. Analyzing the disputed portions of the MSA under established principles of contract interpretation, we conclude the People's interpretation of the meaning of the phrase "initial sponsored event" in the MSA's subsection III(c)(3)(E)(ii) is correct. However, in reaching our conclusion, we decline to apply the People's proffered analysis based on the theory that the overall general intent of the MSA was to reduce youth smoking and promote public health. Though the parties' pleadings acknowledged that the MSA's stated goals included reduction of youth smoking and promotion of public health, the MSA was fundamentally a means of settling litigation by striking a balance between competing interests. As such, the parties expressly agreed that although some outdoor advertising by Reynolds would be prohibited, some would nevertheless be allowed.

A

*Legal Standards for Interpreting the MSA*

█ " 'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party. If it is not, the case is over. [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean?' " (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [66 Cal.Rptr.2d 487].) "In interpreting an unambiguous contractual provision we are bound to give effect to the plain and ordinary meaning of the language used by the parties." (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal.Rptr.2d 809].) Thus, where " 'contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further.' " (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 53 [67 Cal.Rptr.2d 850].) "If the contract is capable of more than one reasonable interpretation, it is

ambiguous [citations], and it is the court's task to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties [citation]." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798 [79 Cal.Rptr.2d 273].) However, the "mere fact that a word or phrase in a [contract] may have multiple meanings does not create an ambiguity." (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1118 [90 Cal.Rptr.2d 647, 988 P.2d 568] (*Palmer*).)

"The goal of contractual interpretation is to determine and give effect to the mutual intention of the parties." (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 763 [110 Cal.Rptr.2d 844, 28 P.3d 889]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) Thus, a "court's paramount consideration in construing [a] stipulation is the parties' objective intent when they entered into it." (*Sy First Family Ltd. Partnership v. Cheung* (1999) 70 Cal.App.4th 1334, 1341 [83 Cal.Rptr.2d 340]; accord, *Pardee Construction Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1352 [92 Cal.Rptr.2d 443]; *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1240 [88 Cal.Rptr.2d 777].) "That intent is to be inferred, if possible, solely from the written provisions of the contract." (*Pardee*, at p. 1352.) " 'All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument.' " (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238 [52 Cal.Rptr.2d 82, 914 P.2d 160].) "Generally speaking, 'the rules of interpretation of written contracts are for the purpose of ascertaining the meaning of the *words used* therein . . . .' " (*Miscione v. Barton Development. Co.* (1997) 52 Cal.App.4th 1320, 1326 [61 Cal.Rptr.2d 280].)

Thus, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.)[8] "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (§ 1638.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." (§ 1639.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (§ 1641.) "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (§ 1643.) "The words of a contract are to be

---

[8]All further statutory references are to the Civil Code unless otherwise specified.

understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (§ 1644.)

■ In sum, courts must give a " 'reasonable and commonsense interpretation' " of a contract consistent with the parties' apparent intent. (Cf. *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744 [110 Cal.Rptr.2d 828, 28 P.3d 876] (*Renee J.*).) The language " ' "in a contract must be construed in the context of that instrument as a whole." ' " (*Palmer, supra,* 21 Cal.4th at p. 1118.) Further, if possible, the court should give effect to every provision of the contract. (*National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1279 [105 Cal.Rptr.2d 237] (*National City*).)

B

*Same Meaning Rule*

■ Seeking reversal of the summary judgment, Reynolds contends the phrase "initial sponsored event" used in the MSA's subsections III(c)(2)(A) and III(c)(3)(E)(ii) must be interpreted under the "same meaning rule," a rule of contract interpretation requiring that an identical phrase or word used in a contract be given the same meaning throughout the contract in the absence of any anything in the contract suggesting otherwise. (*Palmer, supra,* 21 Cal.4th at pp. 1116-1117; *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 741 [222 Cal.Rptr. 1, 710 P.2d 833]; *Caminetti v. Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 358 [139 P.2d 908]; *ML Direct, Inc. v. TIG Specialty Ins. Co.* (2000) 79 Cal.App.4th 137, 142 [93 Cal.Rptr.2d 846]; *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1478 [77 Cal.Rptr.2d 479]; *Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1486 [237 Cal.Rptr. 473] ["words used in a certain sense in one part of a contract are deemed to have been used in the same sense elsewhere in that instrument"].) Specifically, Reynolds characterizes the phrase "initial sponsored event" in the MSA's subsection III(c)(2)(A) as an "arbitrary combination of words with a fixed meaning" that clarified a "time restriction" on Brand Name Sponsorships by limiting any Brand Name Sponsorship to a 12-month period measured from the first event in the Brand Name Sponsorship series as a whole. Attaching the same meaning to the phrase "initial sponsored event" as used later in the MSA's subsection III(c)(3)(E)(ii), Reynolds concludes the time restriction imposed by that subsection should also be interpreted as measured from the first event of the Brand Name Sponsorship as a whole.

However, when reasonably read in context, the phrase "initial sponsored event" had different meanings in those two disputed MSA subsections. (§ 1641; cf. *Palmer*, at p. 1118.)

 We agree with Reynolds that when considered in context, the phrase "initial sponsored event" as used in the MSA's subsection III(c)(2)(A) referred to the first event of Reynolds's Brand Name Sponsorship series as a whole in limiting Reynolds to a single Brand Name Sponsorship in any 12-month period measured from the date of the initial sponsored event in the series. However, we reject Reynolds's contention that there was no difference in context between the MSA's two uses of the phrase "initial sponsored event" sufficient to overcome the presumption such phrase had the same meaning in the two disputed MSA subsections. Instead, a reasonable reading of those two subsections in context indicates the same meaning rule should not apply here. (*Palmer*, *supra*, 21 Cal.4th at p. 1116; § 1641.) The MSA contained no express definition of the phrase "initial sponsored event." The phrase "initial sponsored event" was simply a series of words to be interpreted in light of the context where they were used. Thus, in a parenthetical clause in the MSA's subsection III(c)(2)(A), the phrase "initial sponsored event" was used to identify the date constituting the beginning of the 12-month period when Reynolds could not engage in more that one Brand Name Sponsorship. The MSA's subsection III(c)(2)(A) did not purport to define the term "event" or make any reference to the location of any such event.

In contrast to the MSA's subsection III(c)(2)(A), the language of the MSA's subsection III(c)(3)(E)(ii) expressly referred to the location of the "initial sponsored event." Specifically, as used in the MSA's subsection III(c)(3)(E)(ii), the phrase "initial sponsored event" appeared in the context of limiting the period of time when Reynolds's outdoor advertising could be placed "at the site" of a Brand Name Sponsorship. The term "the site" in the MSA's subsection III(c)(3)(E)(ii) conveyed the plain meaning of one particular location, not multiple locations. (§§ 1638, 1644.) Further, each event in the Brand Name Sponsorship series occurred at a particular racetrack at a distinct time. As such, no individual racetrack constituted "the site" of the sponsored series as a whole. Thus, reasonably read, the phrase "initial sponsored event" as used in the MSA's subsection III(c)(3)(E)(ii) referred to the first event at each particular racetrack where a portion of the 12-month Brand Name Sponsorship series took place in limiting Reynolds's placement of advertising at each respective racetrack to a period beginning 90 days before the initial sponsored event at that racetrack and ending 10 days after the last sponsored event at that racetrack. Further, when the two disputed

MSA subsections are reasonably read in context, there is no conflict between the two meanings of the phrase "initial sponsored event." Manifestly, on the one occasion that the first event at a particular site is also the first event in the 12-month Brand Name Sponsorship series as whole, the phrase "initial sponsored event" reasonably conveys both meanings with respect to that one event.

In interpreting the meaning of the phrase "initial sponsored event" used in the MSA's subsection III(c)(3)(E)(ii) as site-specific, we reject Reynolds's contention that the phrase "at the site of a Brand Name Sponsorship" used in that subsection referred only to the location where the outdoor advertising could be placed and had no effect on the subsection's assertedly "independent" temporal requirement. More particularly, citing the language of the MSA's subsection III(c)(3)(D), Reynolds contends that if the MSA's drafters had intended to make the temporal restriction in the MSA's subsection III(c)(3)(E)(ii) site-specific, they could have done so.[9] However, the MSA's subsection III(c)(3)(D)(ii)'s parenthetical phrase "during such event" is itself open to interpretation. Although Reynolds characterizes the temporal restriction of the MSA's subsection III(c)(3)(D)(ii) as "limited to the duration of a single event," nothing in such subsection or elsewhere in the MSA defined the term "event." Thus, to the extent Reynolds contends the word "event" in the MSA's subsection III(c)(3)(E)(ii) referred to the Brand Name Sponsorship series itself, the word "event" in subsection III(c)(3)(D)(ii) could also refer to the Brand Name Sponsorship itself. However, since the term " 'Brand Name Sponsorship' " as defined by the MSA's subsection II(j) was not solely in the singular, Brand Name Sponsorship did not necessarily mean only one "event" but instead, as Reynolds acknowledges, expressly included "one or more events within a single national or multi-state series or tour." Hence, if the MSA's subsection III(c)(3)(E)(ii) had been meant to convey the non-site-specific interpretation proffered by Reynolds, the drafters would have used the term "Brand Name Sponsorship" in that subsection in place of the phrases "initial sponsored event" and "last sponsored event."

---

[9]The MSA's subsection III(c)(3)(D) provided that "nothing contained in the provision of subsections III(f) [entitled 'Ban on Tobacco Brand Name Merchandise'] and III(*i*) [entitled 'Limitation on Third-Party Use of Brand Names'] shall apply to apparel or other merchandise: (i) marketed, distributed, offered, sold, or licensed *at the site of a Brand Name Sponsorship* permitted pursuant to subsections (2)(A) or (2)(B)(i) by the person to which the relevant Participating Manufacturer has provided payment in exchange for the use of the relevant Brand Name in the Brand Name Sponsorship or a third-party that does not receive payment from the relevant Participating Manufacturer (or any Affiliate of such Participating Manufacturer) in connection with the marketing, distribution, offer, sale or license of such apparel or other merchandise; or (ii) used *at the site of a Brand Name Sponsorship* permitted pursuant to subsection (2)(A) or (2)(B)(i) (*during such event*) that are not distributed (by sale or otherwise) to any member of the general public . . . ." (Italics added.)

Interpretation of the phrase "initial sponsored event" in the MSA's subsection III(c)(3)(E)(ii) as site-specific is consistent with a reasonable and commonsense application of the rules of contract interpretation congruent with the parties' apparent intent. (Cf. *Renee J., supra*, 26 Cal.3d at p. 744.) Considered in context, the temporal restriction set forth in the MSA's subsection III(c)(3)(E)(ii) was meant to permit Reynolds to place outdoor advertising signs to alert race fans to Brand Name Sponsorship series events that were scheduled or ongoing at various individual racetracks at various times as well as to afford Reynolds a reasonable period of time to remove those signs. Thus, by allowing Reynolds to give race fans ample notice of its sponsorship of an upcoming/ongoing event at a particular racetrack and to remove the signs after the last event at such racetrack, the People's proffered site-specific interpretation of the MSA's subsection III(c)(3)(E)(ii) gave effect to each provision of that subsection in the context of the MSA as a whole. (§ 1641; *Palmer, supra*, 21 Cal.4th at p. 1118; *National City, supra*, 87 Cal.App.4th at p. 1279.) In sum, since when reasonably interpreted the phrase "initial sponsored event" as used in the two disputed MSA provisions had different meanings, Reynolds's reliance on the same meaning rule is unavailing. (*Palmer*, at p. 1116.)

## C

### Last Antecedent Rule

Also unavailing is Reynolds's reliance on the "last antecedent rule," a rule of statutory and contractual interpretation requiring that prepositional phrases be read to modify the preceding term or phrase. (*Renee J., supra*, 26 Cal.4th at p. 743 [" 'A longstanding rule of statutory construction—the "last antecedent rule"—provides that "qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote" ' "], citing *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191] (*White*); *City of Victorville v. County of San Bernardino* (1991) 233 Cal.App.3d 1312, 1322 [285 Cal.Rptr. 206]; *State Farm Mut. Auto. Ins. Co. v. Eastman* (1984) 158 Cal.App.3d 562, 569 [204 Cal.Rptr. 827]; *Anderson v. State Farm Mut. Auto. Ins. Co.* (1969) 270 Cal.App.2d 346, 349 [75 Cal.Rptr. 739] (*Anderson*) ["A limiting clause is to be confined to the last antecedent, unless the context or evident meaning requires a different construction"].)

Reynolds characterizes the People's interpretation of the MSA's subsection III(c)(3)(E)(ii) as hinging on interpreting the subsection's phrase "at the

site" as modifying its assertedly "remote" phrases "initial sponsored event" and "last sponsored event," an interpretation deemed by Reynolds to violate the last antecedent rule. Asserting the phrase "at the site" appeared only once in the MSA's subsection III(c)(3)(E)(ii) as the "locational object" of the clause "it is placed," Reynolds contends the phrase "at the site" does not even arguably modify the phrase "initial sponsored event." Reynolds thus concludes that application of the last antecedent rule here would compel the interpretation that the phrase "at the site" in the MSA's subsection III(c)(3)(E)(ii) modified the immediately preceding term "placed" and simply limited *"where"* signs could be "placed" without any bearing on the subsequent phrase "initial sponsored event" that limited *"when"* signs could be posted.

However, the last antecedent rule is " 'not immutable' " and should not be "rigidly applied" in all cases. (*In re Phelps* (2001) 93 Cal.App.4th 451, 456 [113 Cal.Rptr.2d 217] (*Phelps*).) One court-identified exception to the last antecedent rule "provides that when several words are followed by a clause that applies as much to the first and other words as to the last, ' " 'the natural construction of the language demands that the clause be read as applicable to all.' " ' " (*Renee J., supra*, 26 Cal.4th at p. 743; *White, supra*, 31 Cal.3d at pp. 680-681; *Phelps*, at p. 456; *Board of Trustees v. Judge* (1975) 50 Cal.App.3d 920, 926 [123 Cal.Rptr. 830] (*Board of Trustees*).) Further, "the rule of the last antecedent is merely an aid to construction, applicable only where there exist uncertainties and ambiguities. [Citations.] This merely means, however, that if the clear intent of the parties is opposed to the application of the rule, the rule must yield." (*Anderson, supra*, 270 Cal.App.2d at pp. 349-350.)

The exemplar application of the last antecedent rule is a case where a modifying phrase appears after a list of multiple items or phrases. (See, e.g., *White, supra*, 31 Cal.3d at p. 679.) This is not the classic case for application of the last antecedent rule since the MSA's subsection III(c)(3)(E)(ii) did not consist of a list of multiple words followed by a modifier. Instead, the MSA's subsection III(c)(3)(E)(ii) simply stated that nothing in the provisions of the MSA's subsection III(d) involving outdoor advertising would "apply to Outdoor Advertising advertising the Brand Name Sponsorship, to the extent that such Outdoor Advertising is placed at the site of a Brand Name Sponsorship *no more than 90 days before the start of the initial sponsored event*, is removed within 10 days after the end of the last sponsored event, and is not prohibited by subsection (3)(A) above."

Further, the language of the MSA's subsection III(c)(3)(E)(ii) manifestly came within the exception to the last antecedent rule identified in *Renee J.*,

*supra*, 26 Cal.4th at page 743; *White, supra,* 31 Cal.3d at pages 680-681; *Phelps, supra,* 93 Cal.App.4th at page 456; and *Board of Trustees, supra,* 50 Cal.App.3d at page 926. Specifically, with respect to the central clause in subsection III(c)(3)(E)(ii) that exempted Reynolds's outdoor signage "to the extent that such Outdoor Advertising is placed at the site of a Brand Name Sponsorship no more than 90 days before the start of the initial sponsored event," the words "at the site of a Brand Name Sponsorship" were followed immediately by the temporal restrictions relating to the start of the initial sponsored event without interruption by a comma and later by the temporal restrictions relating to the end of such event. (*White,* at p. 680; *Phelps,* at p. 456.) Thus, the natural construction of the central clause's language compelled that its phrase "at the site" be read as applying to the subsection's temporal restrictions as well as to the restriction on where Reynolds's outdoor advertising could be permissibly placed. Moreover, similar to the situation in *Phelps,* "there is only one antecedent and the qualifying phrase therefore must attach to all of it." (*Phelps,* at p. 457.) As such, the language of the central clause of the MSA's subsection III(c)(3)(E)(ii) clearly indicated it was "intended as a *single* phrase, or antecedent to the qualifying clause. Under this construction, the 'last antecedent rule' has no application." (*Phelps,* at p. 457.)

In sum, since the fact that the words "at the site" in the MSA's subsection III(c)(3)(E)(ii) limiting *where* Reynolds's signs could be posted did not preclude those words from also limiting *when* the signs could be posted, Reynolds's reliance on the last antecedent rule is unavailing.

D

*Reynolds's Commercial Speech Rights*

Reynolds characterizes the MSA as imposing a variety of express prohibitions and restrictions on Reynolds's marketing and advertising practices while otherwise preserving Reynolds's commercial speech rights by permitting signs promoting its Brand Name Sponsorship. (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 564 [121 S.Ct. 2404, 2426, 150 L.Ed.2d 532] ["As the State protects children from tobacco advertisements, tobacco manufacturers and retailers and their adult consumers still have a protected interest in communication"].) However, Reynolds contends that in choosing from among the varied contractual interpretations proffered by the parties, the superior court reversibly erred in selecting the interpretation that assertedly created the greatest restriction on Reynolds's First Amendment rights. Although acknowledging it waived any claims that the MSA was

unconstitutional, Reynolds contends it did so only to the extent that the MSA contained express restrictions, limitations or obligations.[10] Thus, characterizing the disputed provisions of the MSA's subsection III(c)(3)(E)(ii) as far from an explicit and unambiguous restriction on its commercial speech rights, Reynolds contends those provisions should be strictly construed against any restriction on its First Amendment rights since such rights were assertedly among Reynolds's constitutional rights that had been reserved in the MSA and not expressly restricted. Accordingly, asserting the record contained no basis for concluding Reynolds clearly and compellingly intended to relinquish its constitutional rights, Reynolds concludes the court should construe the MSA in favor of preserving those rights and against a waiver. ■■ ■ ■ (*City of Glendale v. George* (1989) 208 Cal.App.3d 1394, 1397-1398 [256 Cal.Rptr. 742] (*Glendale*).)[11]

■ Specifically, asserting its waiver of constitutional rights in the MSA was limited and must be strictly construed (*Glendale, supra,* 208 Cal.App.3d at p. 1397), Reynolds contends that under the language of the MSA's section XV, its constitutional rights were not waived with respect to restrictions/limitations to which it did not expressly agree. Instead, according to Reynolds, it waived its constitutional rights only with respect to certain specified restrictions/limitations and never agreed that the MSA's subsection III(c)(3)(E)(ii)'s restrictions/limitations on outdoor advertising would extend as far as the People urge. Reynolds thus concludes its constitutional waiver did not extend to the additional assertedly uncontemplated interpretation of such restrictions/limitations proffered by the People.

In essence, despite having expressly waived in the MSA's section XV all rights to challenge the constitutionality of the MSA's express restrictions/

---

[10]Specifically, the MSA's section XV provided in relevant part: "Each Participating Manufacturer further acknowledges that it understands that certain provisions of this Agreement may require it to act or refrain from acting in a manner that could otherwise give rise to state or federal constitutional challenges and that, by voluntarily consenting to this Agreement, it (and the Tobacco-Related Organizations (or any trade associations formed or controlled by any Participating Manufacturer)) waives for purposes of performance of this Agreement any and all claims that the provisions of this Agreement violate the state or federal constitutions. Provided, however, that nothing in the foregoing shall constitute a waiver as to the entry of any court order (or any interpretation thereof) that would operate to limit the exercise of any constitutional right except to the extent of the restrictions, limitations or obligations expressly agreed to in this Agreement or the Consent Decree."

[11]"Ordinarily, a consent judgment cannot be attacked. [Citation.] An exception exists, however, when the judgment is allegedly void on constitutional grounds, on the theory that such a judgment exceeds the court's jurisdiction and is subject to attack at any time." (*Glendale, supra,* 208 Cal.App.3d at p. 1397.) " 'A waiver of First Amendment rights may only be made by a "clear and compelling" relinquishment of them. . . .' [Citation.] 'Moreover, it is well established that courts closely scrutinize waivers of constitutional rights, and "indulge every reasonable presumption against a waiver." [Citations.]' " (*Id.* at p. 1398.)

limitations, Reynolds contends there was an exception to such waiver if an express restriction/limitation in the MSA were construed contrary to Reynolds's preferred interpretation. However, this record reveals that counsel for Reynolds signed the MSA after good faith settlement negotiations. Further, regardless whether Reynolds anticipated a particular unfavorable interpretation of the restrictions/limitations in the disputed express provisions of the MSA, Reynolds nevertheless waived its right to contest those provisions as unconstitutional. (*D. H. Overmyer Co. v. Frick Co.* (1972) 405 U.S. 174, 187 [92 S.Ct. 775, 783-784, 31 L.Ed.2d 124]; *Davies v. Grossmont Union High School Dist.* (9th Cir. 1991) 930 F.2d 1390, 1394-1395.) Thus, even if a restriction/limitation in the disputed express provisions of the MSA were construed contrary to Reynolds's proffered interpretation, those express contractual terms remained express provisions subject to Reynolds's knowing and intentional waiver of the right to contest their constitutionality. Accordingly, Reynolds's claims based upon the alleged violation of its commercial speech rights are unavailing.

IV

DISPOSITION

The judgment is affirmed.

Haller, J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 25, 2003. George, C. J., did not participate therein.