Filed 7/17/23  Petco Animal Supplies Stores v. Encino Equity CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| PETCO ANIMAL SUPPLIES STORES, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ENCINO EQUITY, LLC, <br><br> Defendant and Respondent. | D079793 <br><br><br> (Super. Ct. No. 37-2019-00029800-CL-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall and Rebecca L. Reed for Plaintiff and Appellant.

Williams Iagmin and Jon R. Williams for Defendant and Respondent.

Petco Animal Supplies Stores, Inc. (Petco) appeals from an adverse judgment in the lawsuit it brought against Encino Equity, LLC (Encino Equity), which owns a shopping center where Petco has a retail store.  Based on a disagreement about how to read a provision in its lease with Encino Equity, Petco contends that since 2008 Encino Equity has been overcharging

Petco by using an incorrect property tax calculation to determine how much Petco owes pursuant to the lease. In a bench trial, the trial court determined that the language of the lease was ambiguous on the disputed issue, but it found that the extrinsic evidence supported Encino Equity's interpretation. Based on that determination, the trial court entered judgment against Petco on all of its claims.

We conclude that the trial court properly interpreted the lease based on the proffered extrinsic evidence, and that Petco's appeal therefore lacks merit. We accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Since 1997, Petco has leased space for a store in a shopping center in Encino. At the time of the original lease in 1997 (the Lease), the shopping center was owned by a business entity known as Encino Valley Shopping Center (EVSC), whose principal was Joseph Benjamin. The Lease had an "Initial Term" of 10 years, seven months, which expired on January 31, 2008. In January 2006, during the Initial Term of the Lease, Encino Equity purchased the shopping center from EVSC and became Petco's landlord under the Lease. In July 2007, Petco exercised an option to renew the Lease through January 31, 2013. Petco and Encino Equity then entered into a First Amendment to the Lease in 2012, and a Second Amendment to the Lease in 2017.

The Lease is a triple net lease, under which Petco pays a share of the shopping center's expenses, taxes, and insurance. At issue in this litigation is a provision in the Lease relating to the circumstances under which Petco is obligated to pay for any increase in property taxes caused by a change in ownership of the shopping center.

2

Specifically, the relevant sentence in paragraph 15(b) of the Lease states, "Tenant shall not be responsible for any increase in taxes caused solely by a change in ownership of the Premises during the Initial Term" (the Paragraph 15(b) Language). (Underscoring omitted.) The "Initial Term" is defined in the Lease as ending on January 31, 2008. At trial, the Paragraph 15(b) Language was referred to as a "Prop 13 protection clause," referring to "Proposition 13, adopted in 1978, which limited ad valorem property taxes to 1 percent of a property's assessed valuation and limited annual increases in valuation to 2 percent *without a change in ownership*." (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 380, citing Cal. Const., art. XIII A, §§ 1, 2, fn. omitted, italics added; see also *926 North Ardmore Ave., LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 326 ["A change in ownership triggers reappraisal and reassessment for property tax purposes."].) The Paragraph 15(b) Language was not changed in either the First Amendment or the Second Amendment to the Lease.

From the date it acquired the shopping center in January 2006 until the end of the Initial Term on January 31, 2008, Encino Equity did not charge Petco for any increase in property tax caused by the reassessment after the change of ownership of the shopping center. However, *after* January 31, 2008, Encino Equity began charging Petco for its proportional share of the property tax bill, including the increased amount that was caused by Encino Equity's 2006 purchase of the shopping center. For nearly a decade, Petco paid, without protest, its share of the increased property taxes.

In August 2017, a consultant Petco hired to perform an audit of the Lease notified Encino Equity that, under Petco's interpretation of the Paragraph 15(b) Language, Petco *never* should have been paying for the

3

increase in property taxes caused by the change in ownership of the shopping center in 2006. As Petco interpreted the Paragraph 15(b) Language, "if the Taxes increase due to a change of ownership during Tenant's Initial Term of their Lease, *going forward* Tenant is not responsible for the increase in Taxes resulting from this change in ownership." (Italics added.) According to Petco, since 2008 Encino Equity has been improperly overcharging Petco by approximately $50,000 per year.

Encino Equity disputed Petco's interpretation of the Paragraph 15(b) Language. According to Encino Equity, the Paragraph 15(b) Language expressed "that Petco not be responsible for the payment of tax increases during the initial term but that Petco would be responsible during any renewal period for tax increases occurring during the initial term."

After receiving a three-day notice to pay or quit from Encino Equity, Petco continued to pay the full amount due under the Lease, as interpreted by Encino Equity, but it paid under protest and without waiving its rights under the Lease.

Based on the parties' dispute over the meaning of the Paragraph 15(b) Language, Petco filed the instant lawsuit against Encino Equity in June 2018. The complaint alleged (1) breach of contract; (2) unjust enrichment; (3) conversion; and (4) declaratory relief. Petco alleged that "[t]he Lease expressly states that Petco is not responsible for any increase in property taxes resulting from the sale of the property occurring before the expiration of the Initial Term on January 31, 2008," but Encino Equity had been charging Petco for such an increase in violation of the Lease.

Recognizing that the outcome of the lawsuit would depend on which party was correctly interpreting the Paragraph 15(b) Language, the parties stipulated to bifurcate the action by having Petco's cause of action for

4

declaratory relief tried first in a bench trial. Specifically, the trial court would adjudicate Petco's request for "a judicial determination declaring that the Lease prohibits [Encino Equity] from charging Petco and collecting from it the real estate taxes caused by the 2006 sale."

For the bench trial on the declaratory relief cause of action, the parties submitted a list of stipulated facts regarding their dispute, in which they jointly identified several trial exhibits, many of which were documents from the original negotiation of the Lease in 1996 and 1997. The three trial witnesses were (1) Encino Equity's sole and managing member, Parham "Paul" Minoo; (2) Petco's Senior Director of Property Management and Lease Administration, Pamela Myers, who started at Petco in 2016; and (3) Petco's Senior Manager of Real Estate, Anthony Fuller, who started at Petco in 2017. None of the trial witnesses had personal knowledge of the negotiation of the Lease.[1]

The documentary evidence presented at trial showed that Petco and EVSC negotiated the Lease over several months in 1996 and 1997. The first communication came from Petco's representative as a proposal to enter into a lease with EVSC. Petco specifically proposed a "Proposition 13 Protection" provision that is consistent with Encino Equity's current interpretation of the Paragraph 15(b) Language: "If, during the initial term, a sale, transfer or refinancing of the building is consummated, and as a result thereof, the real property taxes for the building increase pursuing [*sic*] to a reassessment

---

[1] Minoo testified that in connection with his purchase of the shopping center in 2006 he had a conversation with EVSC's principal, Mr. Benjamin (now deceased) in which Benjamin told Minoo he would be able to pass on the increased property taxes to Petco. However, the substance of that conversation was admitted at trial only for the limited purpose of showing Minoo's state of mind.

5

under the terms of Proposition 13, Petco shall not be obligated to pay, during the first term of the lease, any portion of the increase of real property taxes." A revised proposal from Petco sent the next day contains the same language, as does a further revised proposal from Petco.

Approximately two months later, a memorandum between Petco's broker and a Petco employee, which was also sent to EVSC's representative, summarized the "economic parameters" that had been discussed in a recent meeting with EVSC. The parameters are described as including "Prop 13 protection up to year 10."

Shortly thereafter, EVSC's representative sent a letter to Petco, in the form of a term sheet, setting forth his understanding of the parties' agreement. The term sheet includes a "Proposition 13 Protection" provision that is very similar to the provision in the three proposals sent by Petco: "If, during the initial 10 year term, a sale, transfer or refinancing of the building is consummated, and as a result thereof, the real property taxes for the building increase pursuant to a supplemental reassessment, Petco shall not be obligated to pay, during the first term of the lease, any portion of the increase of real property taxes." Petco made some revisions to the term sheet and signed it on October 4, 1996, leaving intact the "Proposition 13 Protection" provision. The parties made further revisions, which also left intact the "Proposition 13 Protection," and EVSC signed the term sheet on October 21, 1996. The term sheet stated that EVSC would prepare a lease, with Petco to "provide [EVSC] a copy of the Petco's Standard Lease to facilitate [EVSC] marrying the terms thereof."

After a gap of approximately four months, on February 10, 1997, a fax was sent from an administrative assistant at Petco to EVSC's representative. It states, "Following please find the Encino Lease as promised. Please be

6

advised that this Lease is subject to review by Landlord and further review by Marc Drasin and Nancy Doran." Attached was a 51-page document titled Petco's "Standard Form Lease." Many provisions in the standard form lease were redlined with revisions. However, one sentence, which was not redlined, states in paragraph 15(b), "Tenant shall not be responsible for any increase in taxes caused solely by a change in ownership of the Premises." At trial, a Petco witness testified that Petco's standard form lease has, for many years, contained the same language in paragraph 15(b) that appears in Petco's fax to EVSC on February 10, 1997.

The only remaining trial exhibit concerning the parties' negotiations was the Lease itself. The Lease, entered into on April 24, 1997, was a further revised version of Petco's standard form lease. With respect to paragraph 15(b), the final version of the Lease added four words to the end of the sentence that appeared in the original standard form lease faxed on February 10, 1997, creating the Paragraph 15(b) Language at issue in this lawsuit. Instead of saying that "Tenant shall not be responsible for any increase in taxes caused solely by a change in ownership of the Premises," the Lease states, "Tenant shall not be responsible for any increase in taxes caused solely by a change in ownership of the Premises *during the Initial Term*." (Underscoring omitted, italics added.)

Because Petco's two witnesses (Myers and Fuller) had only begun their employment at Petco in 2016 and 2017, neither had direct knowledge about whether anyone at Petco had earlier recognized that Encino Equity was passing through increased property tax charges that were due to a change in ownership during the Initial Term of the Lease, or had earlier considered whether such charges were consistent with the provisions of the Lease. One document presented at trial showed that in 2006, after Encino Equity bought

7

the shopping center, but before the expiration of the Initial Term of the Lease in January 2008, Petco closely examined the amounts it was being charged under the Lease and questioned the imposition of an increased property tax charge, stating that "[u]nder the Lease 15(b), Petco is not responsible for tax increases resulting from changes in ownership."  Further, a document showed that in mid-2008, after the expiration of the Initial Term of the Lease, Petco wrote to Encino Equity with questions about the charges under the Lease for the first quarter of 2008 and specifically asked for a copy of the property tax bill.  After receiving the property tax bill, Petco then followed up to ask for information about how Petco's pro rata share was calculated based on that tax bill.  In November 2008, Petco wrote to Encino Equity with a detailed analysis of the billed expenses it was disputing for the first and second quarters of 2008.  Petco indicated that it agreed with the property tax amounts billed by Encino Equity except for the amount attributable to the improper inclusion by Encino Equity of the property taxes for one tax parcel that Petco pointed out it was not responsible for under the terms of the Lease.

Minoo testified that throughout his ownership of the shopping center, Petco consistently and diligently monitored the Lease and received backup documentation, including for the property tax expenses.  Minoo also explained that his negotiation of the renewal and amendments to the Lease "would have been completely different" if Petco had questioned its obligation to pay the increased property taxes prior to 2017, which it did not do.

The trial court issued a statement of decision, finding in favor of Encino Equity regarding the interpretation of the Paragraph 15(b) Language.  The trial court explained that "paragraph 15(b) is vague, ambiguous and reasonably susceptible to more than one interpretation," but that Encino

8

Equity's interpretation was "more consistent with the intention of the parties." Therefore, the trial court ruled that "after the expiration of the initial term, [Encino Equity] was entitled to pass through increased real estate taxes to [Petco]."

Petco submitted objections to the statement of decision, and the trial court overruled them. The trial court subsequently granted a motion for nonsuit on Petco's remaining causes of action, and judgment was entered in favor of Encino Equity.

## II.

## DISCUSSION

Petco contends that we should reverse the judgment because the evidence does not support the trial court's interpretation of the Paragraph 15(b) Language.

A.    *Applicable Legal Standards*

We begin with the applicable legal standards governing contractual interpretation when, as here, extrinsic evidence is offered on the issue.

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (*Id.*, § 1638.) On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' " (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265.)

"The parol evidence rule is codified in Code of Civil Procedure section 1856 and Civil Code section 1625. It provides that when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing." (*Riverisland Cold Storage, Inc. v.*

9

*Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174.)

However, "extrinsic evidence is admissible to explain or interpret ambiguous

language." (*Lonely Maiden Productions, LLC v. GoldenTree Asset

Management, LP* (2011) 201 Cal.App.4th 368, 376 [citing Code Civ. Proc.,

§ 1856, subds. (b) & (g)].) Deciding whether extrinsic evidence may be

admitted to interpret allegedly ambiguous contractual language "involves a

two-step process." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).)

At the first step, the question of whether "the contract is reasonably

susceptible to a party's interpretation can be determined from the language

of the contract itself [citation] or from extrinsic evidence of the parties'

intent." (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th

839, 848.) "Trial courts are required to receive provisionally any proffered

parol evidence that is relevant to show whether the contractual language is

reasonably susceptible to a particular meaning." (*Adams v. MHC Colony

Park, L.P.* (2014) 224 Cal.App.4th 601, 620, fn. omitted (*Adams*).) "[T]he

court provisionally receives (without actually admitting) all credible evidence

concerning the parties' intentions to determine 'ambiguity,' i.e., whether the

language is 'reasonably susceptible' to the interpretation urged by a party."

(*Winet, supra,* 4 Cal.App.4th at p. 1165.) " 'Even if a contract appears

unambiguous on its face, a latent ambiguity may be exposed by extrinsic

evidence which reveals more than one possible meaning to which the

language of the contract is yet reasonably susceptible.' " (*Dore v. Arnold

Worldwide, Inc.* (2006) 39 Cal.4th 384, 391.) "Whether a contract is

ambiguous at this initial step of analysis presents a question of law subject to

independent review on appeal." (*Thompson v. Asimos* (2016) 6 Cal.App.5th

970, 986 (*Thompson*).)

10

At the second step, "[i]f in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract." (*Winet, supra*, 4 Cal.App.4th at p. 1165.) At this step, when a trial court resolves an ambiguity in the meaning of the contract, "the appellate standard of review turns on whether the trial court based its interpretation on the resolution of conflicts in the evidence. Our review is de novo where the evidence is undisputed . . . ." (*Thompson, supra,* 6 Cal.App.5th at p. 987.) " 'This is true even when *conflicting inferences* may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation.' " (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 433, italics added.) "[B]ut where the trial court's interpretation rests on its resolution of *conflicting evidence*, 'any reasonable construction will be upheld as long as it is supported by substantial evidence.' " (*Thompson,* at p. 987, italics added.)

Here, although the parties presented extrinsic evidence during the trial, we perceive no *conflict* in that evidence. Much of the trial was based on the parties' *stipulated* facts and on historical documentary evidence of undisputed authenticity. Moreover, the three witnesses who testified did not disagree between themselves on any relevant factual matter. The parties have not identified a single material fact on which the evidence was actually in conflict, and our own review of the record has not uncovered any such conflict. Accordingly, we will apply a de novo standard of review to the trial court's application of the extrinsic evidence to interpret the Lease. (*Thompson, supra,* 6 Cal.App.5th at p. 987.)

B.      *The Paragraph 15(b) Language is Facially Ambiguous*

11

Turning to the first step of the inquiry, we inquire whether the Paragraph 15(b) Language is ambiguous by examining whether it is " 'reasonably susceptible' " to the different interpretations urged by the parties. (*Winet, supra,* 4 Cal.App.4th at p. 1165.) "Ambiguity exists when a contractual provision is susceptible of two or more reasonable constructions." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 847.) Although we may consider proffered parol evidence in deciding whether contractual language is reasonably susceptible to a meaning urged by one of the parties (*Adams*, *supra,* 224 Cal.App.4th at p. 620), resort to such evidence is not necessary here because, as we will explain, the Paragraph 15(b) Language is ambiguous on its face. (See *Yahoo Inc. v. National Union Fire Ins. Co. etc.* (2022) 14 Cal.5th 58, 68-69 (*Yahoo*) [deciding the language in an insurance policy was facially ambiguous because it was unclear whether a restrictive clause modified a single word or a group of words].)

The sentence at issue is as follows: "Tenant shall not be responsible for any increase in taxes caused solely by a change in ownership of the Premises during the Initial Term." (Underscoring omitted.) As we will discuss, the meaning of the sentence changes depending on what part of the sentence "during the Initial Term" is meant to modify. Any qualified speaker of the English language would see two different possibilities, and neither the sentence itself, nor the surrounding provisions in the Lease, contain any definitive indication of which possibility is intended.

First, "during the Initial Term" may be intended to modify the entire sentence, as if it was placed at the beginning of the sentence. The meaning would be the same as stating "*During the Initial Term*, Tenant shall not be responsible for any increase in taxes caused solely by a change in ownership of the Premises." Under that reading, the Tenant is not required to pay

increased taxes during the Initial Term but would have to pay thereafter. That interpretation is one of the plausible and natural readings of the sentence.

Second, "during the Initial Term" may be intended to modify only the concluding phrase "a change in ownership of the Premises." Under that reading, for the *entire* time that the Lease is operative, the Tenant is not required to pay increased taxes if there is a change of ownership *during the Initial Term*. This interpretation, too, is one of the plausible and natural readings of the sentence.

Therefore, we conclude that the Paragraph 15(b) Language is ambiguous on its face because it is susceptible to two reasonable constructions.

C.     *The Extrinsic Evidence Shows That the Parties Intended the Protection from Petco's Payment of Increased Property Taxes to Last Only During the Initial Term of the Lease*

At the second step, having concluded that the Paragraph 15(b) Language is ambiguous, we look to the extrinsic evidence identified at trial to conduct our de novo interpretation of the parties' intent in using that language. (*Winet*, *supra*, 4 Cal.App.4th at p. 1165.) As we have explained, the primary extrinsic evidence at issue is the documentary evidence of the negotiations between Petco and EVSC in 1996 and 1997.

As Petco characterizes the documentary evidence, the Paragraph 15(b) Language should be interpreted as creating Proposition 13 protection for as long as the Lease is operative if the property is sold during the Initial Term because such a provision represents *a compromise* between EVSC's and Petco's competing proposals. Focusing on the content of the draft version of the Lease that Petco faxed to EVSC on February 10, 1997, Petco argues: "Petco's proposed Proposition 13 period of protection was without limit.

13

[EVSC's] was for the Initial Term. None of the language proffered by either party was accepted and instead paragraph 15(b) contains language reflecting a middle ground." We reject this characterization because it fundamentally mischaracterizes the documentary evidence and the substance of the parties' negotiations.

It was not *EVSC* who proposed a period of Proposition 13 protection for the Initial Term. Instead, it was *Petco* who proposed that limited period of protection in its *very first* offer to EVSC. And Petco consistently agreed to that position throughout the course of the negotiations, including in the term sheet that sets forth the terms of the parties' deal. Further, there is no evidence that EVSC ever disagreed in any manner with Petco's proposed provision regarding Proposition 13 protection being limited to the Initial Term. There was agreement from the start.

It is only in Petco's February 10, 1997 markup of its standard form lease that the documentary evidence first reflects a Proposition 13 protection provision that is *different* from what the parties consistently agreed upon throughout their negotiations. Specifically, a marked-up version of Petco's standard form lease faxed by Petco on February 10, 1997 states, "Tenant shall not be responsible for any increase in taxes caused solely by a change in ownership of the Premises." It is undisputed that this Proposition 13 protection provision was an *original* term in the standard form lease that the parties had agreed to use as the skeleton for their written contract. Petco did not revise that standard provision when it marked up the standard form lease it faxed to EVSC on February 10, 1997. However, there was no evidence presented at trial to suggest that Petco made an *intentional* and *knowing* choice to include the unrevised Proposition 13 provision in the February 10, 1997 draft. Therefore, the most reasonable inference from the

14

evidence is that Petco's standard Proposition 13 provision appeared in the February 10, 1997 draft because the person charged with marrying the parties' term sheet with the language of Petco's standard form lease unintentionally neglected to revise that provision to conform to the agreement set forth in the parties' term sheet. We accordingly reject Petco's attempt to characterize Petco's inclusion of the Proposition 13 protection language from its standard form lease on February 10, 1997 as a *new* proposal from Petco for blanket Proposition 13 protection during the entirety of the lease, from which the parties were required to reach a "middle ground" in the final version of the Lease.

With that background in mind, the intent of the parties in adopting the Paragraph 15(b) Language that appears in the final version of the Lease becomes clear. The phrase "during the Initial Term" was added to the language of Petco's standard form lease in an attempt to make it conform to the consistent position of the parties throughout the negotiations about the scope of the Proposition 13 protection. As the parties clearly agreed throughout their negotiations, and in their term sheet, the Proposition 13 protection would last only through the Initial Term of the Lease. As that meaning is one of the plausible and natural readings of the Paragraph 15(b) Language, in our de novo review of the contractual language, we interpret the Lease to include Proposition 13 protection only during the Initial Term of the Lease.

In their briefing, the parties discuss two rules of contractual interpretation to support their respective interpretations of the Paragraph 15(b) language. As we will explain, neither rule changes our conclusion that the Lease limits Proposition 13 protection to the Initial Term.

15

First, Petco relies upon the "last antecedent rule." That "rule provides that ' " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding [them] and are not to be construed as extending to or including other[ ] [words or phrases] more remote.' " ' [Citations.] The last antecedent rule is often applied where there is a list of terms, and the qualifying words or phrases follow the last item in the list." (*Yahoo, supra,* 14 Cal.5th at pp. 73-74.) Indeed, "[t]he exemplar application of the last antecedent rule is a case where a modifying phrase appears after a list of multiple items or phrases." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 530 (*R.J. Reynolds*).) The last antecedent rule is " ' "not immutable" ' and should not be 'rigidly applied' in all cases." (*Ibid.*) " '[I]f the clear intent of the parties is opposed to the application of the rule, the rule must yield.' " (*Ibid.*)

Here, the last antecedent rule is not helpful because the sentence at issue does not consist of "a list of multiple items or phrases" (*R.J. Reynolds, supra,* 107 Cal.App.4th at p. 530) or "a list of terms" (*Yahoo, supra,* 14 Cal.5th at p. 74). Instead, it consists of a *single* phrase, with the question being what *part* of that single phrase is modified by the words "during the Initial Term." If we treat the *entire sentence* as the " ' " 'phrase[ ] immediately preceding' " ' " the modifier (*Yahoo,* at p. 73), then " 'there is only one antecedent and the qualifying phrase therefore must attach to all of it' " (*R.J. Reynolds,* at p. 531). Under similar circumstances, our Supreme Court recently concluded that the last antecedent rule was not useful in interpreting an ambiguous phrase that did not contain a list of items. (*Yahoo,* at p. 75.) In that case, the ambiguous language in an insurance policy was the phrase " '[o]ral or written publication, in any manner, of material that violates a person's right of privacy.' " (*Id.* at p. 64.) The last

16

antecedent rule did not aid in determining what part of the phrase was modified by the concluding words "that violates a person's right of privacy" because there was "no list of items followed immediately by a modifier." (*Id.* at p. 75.) Instead, in attempting to apply the last antecedent rule, "the possible antecedents [were] either (1) the *entire phrase* '[o]ral or written publication, in any manner, of material,' or (2) merely the *final word* of that phrase, 'material.' " (*Ibid.*) The last antecedent rule did "not resolve, . . . whether the relative clause 'that violates a person's right of privacy' modifies just the *word* that immediately precedes it (i.e., the word 'material') or whether the clause modifies the *entire phrase* that immediately precedes it." (*Ibid.*) The same problem exists here. Because there is no list of items followed immediately by a modifier, the last antecedent rule shines no light on whether the *entire* phrase comprising the Paragraph 15(b) Language is modified by the concluding words "during the Initial Term" or whether only the last seven words of the phrase—"a change in ownership of the Premises"—are modified.

Moreover, even if we were to conclude that the last antecedent rule applied in a manner that supported Petco's interpretation, we would reject that interpretation as contrary to the " 'clear intent of the parties.' " (*R.J. Reynolds*, *supra*, 107 Cal.App.4th at p. 530.) As we have explained, the undisputed documentary evidence shows that from the very beginning of EVSC's and Petco's negotiations, they agreed that the Proposition 13 protection would last only through the Initial Term of the Lease.

Next, Encino Equity contends that we should look at the parties' course of performance to determine the meaning of the Paragraph 15(b) Language. " 'It is well settled that although an agreement may be indefinite or uncertain in its inception, the subsequent performance of the parties will be considered

17

in determining its meaning for they are least likely to be mistaken as to the intent.' " (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1449; see also Code Civ. Proc., § 1856, subd. (c) ["The terms set forth in a writing . . . may be explained or supplemented by course of dealing or usage of trade or by course of performance."].) "[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight . . . ." (*Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 761.)

Here, it is undisputed that Petco performed under the Lease from 2008 to 2017 by paying the increased amount of property taxes due to the change in ownership of the shopping center. That course of performance would tend to support Encino Equity's interpretation of the Paragraph 15(b) Language. However, Petco argues that its payment of the increased property taxes for a decade is not probative because there is no evidence that Petco *knew* it was being billed for the increased amount. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 543 ["The Restatement, which ' "California usually follows" '. . . suggests that . . . evidence of acceptance or acquiescence in a course of performance requires 'repeated occasions for performance by either party *with knowledge* of the nature of the performance and opportunity for objection to it by the other.' (Rest. 2d, Contracts § 202(4))" (italics added)].)

On our de novo examination of the undisputed extrinsic evidence, we are not persuaded by Petco's argument. The most reasonable inference from the evidence presented at trial was that Petco would have been aware in 2008 that it had started to pay the increased property tax amounts billed by Encino Equity. As Minoo testified, Petco consistently monitored the Lease

18

and regularly received backup documentation, including for property taxes. It is undisputed that the amount Petco paid for the property tax expenses increased by a *significant* amount due to the change in ownership, namely, by more than $50,000 over the previous year. It is not reasonable to conclude that Petco would have failed to notice that significant increase. It is especially unlikely that Petco would have failed to notice the increase because the documentary evidence presented at trial showed that immediately after Encino Equity starting billing Petco for the increased property taxes, Petco examined the property tax charges for the first and second quarter of 2008 *in detail*. It questioned one unrelated aspect of the property taxes billed by Encino Equity, namely, the improper inclusion of the charges from a particular tax parcel, but it did not question the inclusion of the increased amount due to a change in ownership.

Even were we to accept Petco's contention that the parties' course of performance is not probative, our interpretation of the Paragraph 15(b) Language would not change. The only significance of the course of performance evidence, if applicable, would be to *bolster* Encino Equity's interpretation of the Paragraph 15(b) Language. However, the course of performance evidence is not needed for us to arrive at the interpretation advanced by Encino Equity, because, as we have explained, the extrinsic evidence of the negotiations between EVSC and Petco in 1996 and 1997 establishes the parties' clear intent to limit the Proposition 13 protection to the Initial Term of the Lease.

## DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DO, J.