Filed 9/8/21  Lorta v. Bishop, Inc. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JACOB LORTA et al., | |
| Plaintiffs and Appellants, | G059175 |
| v. | (Super. Ct. No. 30-2018-01006766) |
| BISHOP, INC., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Theodore Howard, Judge.  Reversed with instructions.

Donahoo & Associates, Richard E. Donahoo; Esner, Chang & Boyer and Stuart B. Esner for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Robert Mussig and Matthew G. Halgren for Defendant and Respondent.

\*          \*          \*

Plaintiffs are former employees of defendant Bishop, Inc. (Bishop), who brought various labor claims, including unpaid wages, overtime violations, and unpaid meal and rest breaks.[1] Bishop quickly realized it had, in fact, underpaid plaintiffs, and sent an aggregate of approximately $112,000 as compensation for unpaid wages and associated penalties. That payment explicitly did not require a release of any claims. There were no strings attached. And it only covered unpaid wages, not the meal and rest break violations. Accordingly, litigation continued on all claims.

The parties ultimately went to mediation and settled the case. Or so plaintiffs thought. The parties signed a settlement stipulation that required Bishop to pay plaintiffs $225,000 in "new money." Although the settlement contemplated the preparation of a long form settlement agreement, the stipulation signed during mediation was explicitly binding and subject to enforcement by the court. The parties negotiated a long form settlement agreement, including the allocation of how the $225,000 would be divided between the five plaintiffs, but on the eve of Bishop's obligation to pay, it refused to comply with the settlement.

Plaintiffs filed a motion, pursuant to Code of Civil Procedure section 664.6, to enforce the settlement agreement. Bishop opposed the motion. Its principal claimed he thought "new money" included the $112,000 Bishop had already paid plaintiffs. The court agreed and, after various writ proceedings, entered judgment in favor of plaintiffs for $113,000. Plaintiffs appealed.

We reverse. New money means new money, not old money. The earlier payment was explicitly no strings attached. It was not part of a settlement agreement; it was simply *Bishop's* calculation of what it owed the plaintiffs. The $225,000 "new money" payment, on the other hand, was explicitly in exchange for plaintiffs releasing all

---

[1] The individual plaintiffs are Jacob Lorta, Daniel Velasco, Warren Little, Jorge Lopez and Douglas Boal.

2

their claims.  Plaintiffs were entitled to a new $225,000 payment under the settlement agreement.

FACTS

In July 2018, the five individual plaintiffs filed a complaint against Bishop, alleging they were employed in various construction capacities on public works projects for which Bishop was a contractor.  They asserted six causes of action:  (1) Failure to pay wages and overtime; (2) failure to pay prevailing wages on public works; (3) failure to pay wages of terminated or resigned employees; (4) failure to provide or otherwise compensate for missed meal and rest breaks; (5) recovery under public works bonds; and (6) unfair competition in violation of Business and Professions Code section 17200 et seq.

In November 2018, Bishop wrote a letter to plaintiffs' counsel stating it had "discovered an inadvertent shortfall in the payment of wages made to [plaintiffs]."  It enclosed checks for each plaintiff that, in aggregate, amounted to $112,410.66.  The payments were broken down by checks for each plaintiff's wages (less withholdings) and penalties and interest (without any withholdings).  Bishop claimed in the letter that these checks fully compensated plaintiffs for back wages, interest, and waiting time penalties.  It stated, "Bishop is providing these payments in good faith based on its discovery of this inadvertent payroll error in 2016. *These payments are not conditioned on any settlement or release proposal*."  (Italics added.)  The letter went on to acknowledge that these payments did not cover meal and rest break violations, which Bishop denied, but it included a settlement offer pursuant to Code of Civil Procedure section 998.  That offer is not in our record but was presumably rejected.

The parties commenced discovery and eventually began informal settlement negotiations that reached a point where the parties mutually agreed to suspend

3

litigation activities while they pursued a settlement. To facilitate those discussions, the court continued the trial date from July 2019 to January 2020.

The parties' settlement negotiations culminated in a mediation on May 28, 2019. At that mediation, the parties executed a three-page stipulation for settlement. Pursuant to that stipulation, Bishop agreed to pay plaintiffs "the total sum of $225,000 in 'new money' in full settlement and compromise of this action and in release and discharge of any and all claims and causes of action . . . ." The words "in 'new money'" were handwritten and inserted by interlineation into the agreement. Although the stipulation stated that plaintiffs would later provide Bishop with "a standard form of a Release of all . . . claims," it was binding, stating "that the settlement and compromise stated herein is final and conclusive forthwith, and each attorney represents that his/her client(s) has freely consented to and authorized this agreement." Elsewhere it stated, "Any provisions of Evidence Code §§ 1115-1128 notwithstanding, this Stipulation is binding and, if the parties request the court to retain jurisdiction for purposes of enforcement, may be enforced by a motion under Code of Civil Procedure § 664.6 . . . . This Stipulation may also be enforced by any other procedure permitted by law in the applicable state or federal court." "Prior to the entry of a Dismissal with Prejudice, the parties agree to request the court to retain jurisdiction for purposes of enforcing this Stipulation pursuant to California Code of Civil Procedure § 664.6." The stipulation provided that payment pursuant to the settlement was to be made by June 29, 2019.

Over the ensuing two weeks, the parties' respective attorneys negotiated a long form settlement agreement to a point where both sides had agreed on its terms. The long form settlement agreement provided, without objection from Bishop's counsel, that Bishop would pay plaintiffs $225,000 in "new additional money." It further provided a breakdown of exactly how the $225,000 would be divided among the plaintiffs. On June 7, 2019, Bishop's counsel wrote, "we will sign it immediately if you can get the signatures back to us quickly and, if so, everything should be fine to make the payment

4

by June 29." On June 14, 2019, after plaintiffs forwarded Bishop all of the signatures it requested, Bishop's counsel stated, "Thank you, I will get my client's signatures and start preparing the checks."

As the payment deadline approached without any executed settlement from Bishop, plaintiffs' counsel began making inquiries. On June 27, 2019, just two days before the payment deadline, Bishop's counsel acknowledged that Bishop was refusing to sign the agreement. No reason was given other than "buyer's remorse." Ultimately, Bishop did not sign the long form settlement agreement and made no payment under the stipulation for settlement.

The following month, plaintiffs filed a motion to enforce the settlement pursuant to Code of Civil Procedure section 664.6. Plaintiffs' motion did not address whether "new money," as contemplated by the settlement, included the prior payment of $112,000 because, up to that point, Bishop had never made that claim.

In response to the motion, Bishop changed counsel and opposed the motion. In its opposition, Bishop now took the positions that (1) the settlement was an unenforceable agreement to agree, and (2) the earlier payment "extinguished some or all" of plaintiffs' claims. Bishop's president provided a declaration in which he stated, "My understanding was that as part of any final agreement, Bishop would only be required to pay the *difference* between the amount stated in the Stipulation—$225,000—and the amount Bishop had already paid to Plaintiffs to resolve most of the claims in the case— approximately $112,000. In other words, I understood that if the parties were able to reach agreement on a Long Form Settlement, Bishop would only be obligated to pay Plaintiffs an additional $113,000 as part of the deal." This was the first time Bishop had ever made this claim.

The court ultimately rejected Bishop's claim that the stipulation for settlement was merely an agreement to agree, but it concluded there had been no meeting of the minds as to the amount of the settlement. The court was persuaded by Bishop's

5

claim in the letter accompanying the earlier $112,000 payment that the checks were to fully compensate plaintiffs for the wage claims. The court commented, "The cover letter would seem to say it all; however, there is one very curious sentence in the letter that now sits near the heart of the pending dispute. In the letter, defense counsel offered that 'these payments are not conditioned on any settlement or release proposal.' On its face, this just means that payments were admittedly owed and defendant was offering the money in good faith without *quid pro quo*. What the letter should have said was that plaintiffs' acceptance and deposit of the funds would be treated as an accord and satisfaction for the aforementioned portion of their lawsuit." The court also credited Bishop's president's declaration that he believed the settlement amount was for $113,000. It gave plaintiffs the option to either ratify Bishop's understanding that the amount was $113,000, or resume litigation of the claims.

About a month later, plaintiffs petitioned this court for a writ of mandate. We summarily denied it. Plaintiffs filed a petition for review in the California Supreme Court, who granted the petition and transferred the matter back to this court with directions to vacate the denial and to issue an alternative writ to the trial court. We complied.

After further briefing, the trial court modified its order, but essentially adopted its initial rationale, this time enforcing the settlement agreement, but granting Bishop a credit of $112,000. Our court discharged the alternative writ and dismissed the initial writ petition. The trial court entered judgment, and plaintiffs timely appealed.

DISCUSSION

This appeal presents a relatively straightforward issue of contract interpretation—what did the parties mean by "new money"? Given the absence of conflicting extrinsic evidence, we review that issue de novo. (*People ex rel. Lockyer v.*

6

*R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 520.)  We conclude that the words themselves and the circumstances of the case leave but one reasonable interpretation:  "new money" means money not yet paid.

When interpreting a contract, we begin with the words themselves.  (Civ. Code, § 1639.)  If the words are not defined in the contract, we assign the words their ordinary meaning as understood by a layperson.  (Civ. Code, § 1644.)  "'The parties' undisclosed intent or understanding is irrelevant to contract interpretation.'"  (*In re Marriage of Simundza* (2004) 121 Cal.App.4th 1513, 1518.)  Further, we interpret the words in light of the circumstances of the parties at the time of the contract.  (Civ. Code, § 1647.)

Here, the circumstances play an important role in shedding light on "new money"—in particular, the voluntary $112,000 payment and the accompanying letter. When Bishop sent that payment, it explicitly stated that the payment was "not conditioned on any settlement or release proposal."  In other words, no strings attached. Literally, there was no connection between that payment and any settlement proposal. Yet both Bishop and the trial court proceeded to treat that payment as though it was directly connected to a settlement proposal.

Indeed, the court went even further and took the unusual step of essentially rewriting that letter for Bishop.  Describing the disclaimer as a "curious sentence," it went on to prescribe what, in its view, the letter should have said (accord and satisfaction), and then treated the letter as though it *did* say that.  The trial court adopted Bishop's reasoning as follows:  "If plaintiffs were agreeing to take $225,000 to resolve 'all claims and causes of action,' and plaintiffs already received $112,000 for the wage claims (1st, 2nd, 3rd and most of 5th and 6th), the only reasonable inference to draw is that $225,000 was for all six causes of action, leaving $113,000 still to tender for the 4th and the balance of the 5th and 6th causes of action."

7

There is a distinct logical and legal fallacy in that reasoning: it treats the voluntary payment as though it settled plaintiffs' wage claims. In other words, it treats Bishop's letter as though it says what the court thought it *should* say, which is the opposite of what it actually says. What seems to have been lost on the court is that the payment was *Bishop's* calculation of unpaid wages, not plaintiffs. Plaintiffs were still pursuing their wage claims. The subsequent settlement was for all claims, not just the meal and rest break claims. The cover letter accompanying the voluntary payment explicitly stated that acceptance of the payment was not connected to any settlement or release of a claim. That was not a "curious sentence" in that letter—it was the lynchpin! Absent that sentence, the proffered payments potentially take on a completely different effect. (See *Potter v. Pacific Coast Lumber Co.* (1951) 37 Cal.2d 592, 597 ["where a claim is disputed or unliquidated and the tender of a check or draft in settlement thereof is of such character as to give the creditor notice that it must be accepted 'in full discharge of his claim' or not at all, the retention and use of such check or draft constitutes an accord and satisfaction [citation]; and it is immaterial that the 'creditor protests against accepting the tender in full payment' [citation], for in such case 'the law permits but two alternatives, either reject or accept in accordance with the condition'"].)

The other flaw in the court's reasoning is that it ignores the words of the settlement. Plaintiffs did not simply agree to release their claims in exchange for $225,000. It did so in exchange for $225,000 of *new money*. We conclude that a layperson would understand those words to unambiguously mean: money not yet paid. Indeed, given the existence of the prior payment, the only reason to include the words "new money" is precisely to distinguish the settlement payment from the prior voluntary payment.

Bishop claims that "new money" could mean "funds paid outside of what plaintiffs earned while employed." We conclude that interpretation, in this context, stretches the word "new" past its breaking point. Money that was paid six months earlier

8

with no strings attached is not, in any sense, new money. Moreover, what a strange concept to employ in this context. If the parties sought to target a payment six months ago in addition to future payments, why would they utilize a concept about past wages? It makes no sense. If the parties had wanted to include a credit for a payment six months beforehand, just say so. But that is not what they said. The words they actually used clearly refer to future payments, not past payments.

Both Bishop and the court put some weight on the use of the word "net" in the settlement. Handwritten into the agreement was the following provision: "'Settlement Payments' [i.e. the $225,000] shall be delivered to Plaintiffs' counsel in amounts to be provided to defense counsel [within] 7 days. 25% of net payments shall be subject to withholding & W2. 75% of net payments shall not be subject to deduction and will be 1099'd." Bishop and the court both posited that "net" might refer to net of the earlier payment. But that statement refers to payments that "shall be delivered"—future tense. The parties' subsequent conduct clarifies what was meant there. In the long form agreement negotiated between the parties, of the $225,000 in new payments, almost $100,000 was allocated to attorney fees and costs. The payments to the plaintiffs, therefore, were net of fees and costs.

Ultimately, if the parties had meant to settle for $113,000, there would have been a very easy way to do that: write the numbers $113,000 instead of the numbers $225,000. Or simply say the $225,000 includes a credit for the prior payment. That is an important deal point that we would expect to be clearly delineated. Bishop has not offered any persuasive explanation as to why it would say one thing—$225,000—but mean something completely different—$113,000. Instead, it is quite plain that $225,000 in "new money" means precisely that: a new payment of $225,000.

## DISPOSITION

The judgment is reversed. The trial court is instructed to enter a new judgment in favor of plaintiffs in the amount of $225,000 with no credit for the earlier payment of approximately $112,000. Plaintiffs shall recover their costs incurred on appeal.

THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.