Filed 7/29/24  City of San Diego v. San Diego Gas & Electric Co. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CITY OF SAN DIEGO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SAN DIEGO GAS & ELECTRIC COMPANY,<br><br>    Defendant and Respondent. | D081883<br><br><br><br>(Super. Ct. Nos. 37-2020-00002219-CU-BC-CTL, 37-2020-00039026-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Reversed; remanded with directions.

Mara W. Elliott, City Attorney, Jon E. Taylor, Senior Deputy City Attorney, Valerie Silverman Massey, Chief Deputy City Attorney; Meyers Nave, David Skinner, Nicole Ries Fox, and Kristof D. Szoke, for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, David A. Battaglia, Julian W. Poon, James L. Zelenay Jr., Patrick J. Fuster, and Adrienne M. Liu, for Defendant and Respondent.

This case asks us to determine who should pay the utility relocation costs to accommodate two municipal water projects. Under franchise agreements and a manual of administrative practices negotiated with the City of San Diego (City), San Diego Gas & Electric Company (SDG&E) furnishes gas and electricity to residents of San Diego. Relevant here, the City requested that SDG&E relocate some of its facilities, including pipes and poles, to make room for two projects expanding the City's water system. However, SDG&E and the City disagreed regarding who should pay the relocation costs.

The dispute led to the City filing a pair of lawsuits, which the trial court considered related. The primary issue underlying the parties' quarrel is a disagreement regarding which agreement governs. According to the City, the two franchise agreements govern and under those agreements, SDG&E is required to relocate its facilities and equipment at no cost to the City within 90 days of receiving written notice. SDG&E counters that the manual of administrative practices is the key contract. Under that document, as relevant here, the allocation of relocation costs is determined by the type of project requiring SDG&E to move. If the City project is governmental in nature then SDG&E covers the costs. However, if the project is proprietary in nature, the City foots the bill. SDG&E argues that the two projects requiring the relocation are proprietary; thus, the City should bear the relocation costs.

The parties brought cross-motions for summary judgment. The superior court, guided by the parties' agreement that the court must determine whether the subject projects were governmental or proprietary, found the manual of administrative practices governed the dispute, the projects were proprietary, and the City was financially responsible for the

2

cost of relocation. Accordingly, the court denied the City's motion for summary judgment and granted SDG&E's motion.

The City appeals the ensuing judgment, arguing that the trial court erred in determining that the City should bear the relocation costs. To this end, the City again maintains that the franchise agreements govern the dispute. Yet, unlike below, the City unambiguously asserts that those agreements require SDG&E to pay for relocation costs and there is no need for the court to determine whether the water projects are governmental or proprietary. We agree with SDG&E that the City's argument is somewhat different than what it maintained in superior court. That said, the City presents a pure legal argument to which SDG&E has replied. Consequently, we shall address the threshold issue that the parties agree on appeal must be resolved: Which agreement determines which entity pays the relocation costs?

We conclude the City has the better argument. Unlike the manual of administrative practices, the franchise agreements only apply to the City and SDG&E, and the two parties have abided by those agreements for over 50 years. Per the franchise agreements, SDG&E agreed to relocate its "facilities or equipment" "without cost or expense to [the] City" within 90 days of receiving written notice. There is no dispute here that the City provided the required written notice that SDG&E must move its facilities and equipment to accommodate the City's water projects. Under the plain language of the franchise agreements, SDG&E agreed to pay the relocation costs. Therefore, we reverse the judgment in favor of SDG&E and remand the matter back to the superior court with instructions to enter summary judgment in favor of the City.

3

## FACTUAL AND PROCEDURAL BACKGROUND

SDG&E provides gas and electricity to residents of San Diego County and southern Orange County, covering 26 cities. It has operated under constitutional franchises as well as franchise agreements adopted by the City, allowing SDG&E the right to use the public rights-of-way to install and maintain the pipes, poles, and wires necessary to supply natural gas, electricity, and related services. Therefore, SDG&E has spent hundreds of millions of dollars installing and maintaining infrastructure and facilities.

In 1971, the City and SDG&E entered into written gas and electric franchise agreements as set forth in Ordinance Nos. 10465 (Gas Franchise Agreement) and 10466 (Electric Franchise Agreement). The Gas Franchise Agreement and Electricity Franchise Agreement (together, the Franchise Agreements) outlined several of the parties' rights and obligations as to SDG&E's facilities. For example, the agreements confirmed the scope of the rights granted to SDG&E under the franchises. The Gas Franchise Agreement bestowed upon SDG&E the right "to construct, maintain and use in said streets all pipes and appurtenances . . . necessary to transmit and distribute gas suited for, and for use by consumers for, any and all lawful purposes." As such, SDG&E maintained the right "to construct, erect, install, operate, maintain, use, repair, relocate or replace pipes and appurtenances thereto in, upon, along, across, under or over the streets of the City." The Electricity Franchise permitted SDG&E a similar right "to construct, maintain and use in [City] streets all poles, wires, conduits and appurtenances . . . necessary to transmit and distribute electricity suited for, and for use by consumers for, any and all lawful purposes."

The Franchise Agreements granted SDG&E the gas and electricity franchises for 50 years.[1]  In return, SDG&E was required to pay a certain percentage of its gross receipts for the first 30 years of the agreements and then an additional amount during the last 20 years, determined "by good faith negotiation between [the] City and [SDG&E]."

The Franchise Agreements elsewhere addressed the potential relocation of SDG&E's facilities and, to address issues related to relocation, required the parties to negotiate a "Manual of Administrative Practices for Utility Installations in Public Rights-Of-Way in City of San Diego, California" (Manual).  To this end, Section 7 of the Franchise Agreements specified that "[f]ollowing the preparation of said manual, and its approval by the City Council," the Manual "shall govern the installation and removal of [SDG&E]'s facilities in the streets of [the] City."

Also, relevant to the relocation of SDG&E's facilities is section 8 of the Franchise Agreements.[2]  That section provided:

> "(a) City reserves the right for itself to lay, construct, erect, install, use, operate, repair, replace, remove, relocate, regrade or maintain below surface or above surface improvements of any type or description in, upon, along, across, under, or over the streets of the City.  City further reserves the right to relocate, remove, vacate or replace the streets themselves.  If the necessary exercise of the

---

[1]  The term was extended to 2021, and the parties then entered into new franchise agreements.  The new agreements contain a clause indicating that the parties will abide by the courts' final determination of this matter in interpreting the new agreements.

[2]  Section 8 of the Gas Franchise Agreement and section 8 of the Electric Franchise Agreement are substantially similar.  However, there are some minor language differences, depending on the utility to be provided.  These trivial distinctions are immaterial to the issues presented in the instant matter.

aforementioned reserved rights conflicts with any poles, wires, conduits, and appurtenances of [SDG&E] constructed, maintained and used pursuant to the provisions of the franchise granted hereby, whether previously constructed, maintained and used or not, [SDG&E] shall, without cost or expense to [the] City within ninety (90) days after written notice from the City Manager, or his designated representative, and request so to do, begin the physical field construction of changing the location of all facilities or equipment so conflicting. [SDG&E] shall proceed promptly to complete such required work.

"(b) Irrespective of any other provision of this ordinance, [SDG&E]'s right to construct, maintain and use, or remove poles, wires, conduits, and appurtenances thereto shall be subject at all times to the right of the City, in the exercise of its police power, to require the removal or relocation, to either overhead or underground locations, of said poles, wires, conduits and appurtenances thereto at the sole cost and expense of [SDG&E]."

Per section 7 of the Franchise Agreements, the City and SDG&E negotiated the Manual. The parties (as well as 10 additional utilities) approved the first edition of the Manual in 1972. Consistent with section 7, which provided that the Manual be "review[ed] and update[d]," the San Diego City Council approved the operative version of the Manual in 1986. The Manual explains that "the need for a manual . . . was identified during the negotiations which preceded the City Council's franchise grant to the San Diego Gas and Electric Company in 1970."

The Manual declares as "the policy of the City that all utilities operating within the public rights-of-way cooperate in the City of San Diego's program to coordinate their activities with all other users of the public rights-of-way by adhering to the policies and procedures outlined herein."

6

To that end, the Manual identifies several "[m]atters [r]equiring [c]oordination," including "the operating rules" governing "[u]tility locations within the public right-of-way." The pertinent provision governing the "Relocation of Utilities" is section VII. That section provides:

> "All utilities maintaining installations in the public-rights-of-way are required to relocate these utilities whenever relocation is necessary to accommodate public improvements required by the City, subject to franchise conditions and Public Utility Commission rules governing such matters."

The Manual also addresses the costs of relocation. Section VII.1 of the Manual requires, "[i]n general," the costs of utility relocations to be borne "[b]y the City: Where utility facilities rights are prior in time or prior in right to those of the City, or where public rights-of-way have been acquired by annexation." Section VII.2 then sets forth circumstances under which a utility company would be required to relocate its facilities at its own expense where "City facilities and improvements are financed by the City . . . , and where such facilities or improvements are governmental in nature as opposed to proprietary in nature."

The dispute between the parties centers on the application of the Manual and Franchise Agreements to two City water projects.

In 2014, the San Diego City Council approved the Pure Water San Diego Program (Pure Water)—a "phased, multi-year program that will provide more than 40 [percent] of San Diego's water supply locally by the end of 2035." Phase 1 of Pure Water has several component projects "that will clean recycled water to produce 30 million gallons per day of high-quality purified water" and ultimately "reduc[e] the City of San Diego's dependence on imported water." Pure Water facilities will be built throughout San Diego, and the estimated cost of the project is $3 billion.

7

While the City began work on Phase 1 of the Pure Water Project, it was also completing construction under its 2007 Potable Water Master Plan. One of the projects under the master plan was the Montezuma Project, which completed the final segment of the Mid-City Pipeline "to improve the water distribution system reliability." That pipeline, along with the parallel Trojan Pipeline, "will provide approximately 43 million gallons of water to over 500,000 residents of the Mid-City area." The project is estimated to cost $46 million.

Construction of the Pure Water and Montezuma Projects conflicted with prior uses of the San Diego streets, including gas and electric facilities that SDG&E previously installed under the Franchise Agreements. After the City Council approved the Pure Water and Montezuma Projects, SDG&E worked with the City on the projects' design considering the anticipated impact on SDG&E's existing facilities. The City's designs ultimately required the relocation of SDG&E's existing facilities at several locations to clear space for the City's planned new construction.

The parties disagreed about who should shoulder the costs of relocating SDG&E's facilities. SDG&E set forth its position in a letter to the City explaining that SDG&E "is not responsible for any utility relocation costs in the Franchise area." Chief among those reasons was the governmental-proprietary distinction, which requires the City to bear relocation expenses associated with its proprietary projects.

Although the parties did not agree on who should pay for the relocation of SDG&E's facilities, they did not want to delay the City's water projects. Therefore, they entered into a reservation-of-rights agreement in 2019, under which the City agreed to front the costs of relocating SDG&E's facilities for Phase 1 of the Pure Water Project while reserving the right to seek recovery

8

of the funds. In 2020, the parties entered into a substantially similar agreement with respect to the Montezuma Project.

In 2020, the City filed an action in San Diego Superior Court seeking reimbursement of the relocation costs it advanced to relocate SDG&E's facilities to make way for the Pure Water Project. The City filed a substantially similar claim later that same year seeking to recoup the relocation costs incurred because of its Montezuma Project. In addition to reimbursement, the City's complaints also sought a judicial declaration that the parties' agreements obligate SDG&E to relocate any conflicting facilities at its own expense.

After the trial court deemed the two actions related, the parties each filed a single cross-motion for summary judgment to address both cases based on a joint stipulation of undisputed facts. In its motion, the City argued that SDG&E was obligated to pay for relocation costs under "the reserved powers of Section 8 of the Franchise Agreements." In contrast, SDG&E asserted in its motion for summary judgment that the City was required to pay for the relocation costs under the Manual because the City was acting in its "proprietary capacity." Although the parties debated whether the dispute was governed by section 8 of the Franchise Agreements or the Manual, they also both indicated that the determination of whether the municipal water programs were proprietary or governmental in nature would determine which party was financially responsible for the costs.

After entertaining oral argument and considering the motions and evidence before it, the superior court issued a detailed minute order granting SDG&E's motion for summary judgment and denying the City's competing motion. In buttressing its finding that the Manual governed the dispute, the court noted that "both parties . . . effectively conceded in their respective

9

papers, the [Manual] sets forth the essential test: are the City's projects governmental or propriety?" The court then determined that the City's projects were proprietary.

The court subsequently entered final judgment in SDG&E's favor. The City timely filed a notice of appeal.

DISCUSSION

A.    *Standard of Review*

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Where parties have jointly stipulated to undisputed facts, those facts are "judicially admitted." (*Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452.) Those judicial admissions, in turn, "remove[ ] the matter as an issue in the case." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 48.) This court reviews a grant of summary judgment de novo. (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 84.) Similarly, the " 'interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence.' " (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 520.)

B.    *The City Now Unambiguously Argues the Franchise Agreements Require SDG&E to Pay Relocation Costs Regardless of Whether the Water Projects are Governmental or Proprietary in Nature*

Here, the facts are undisputed. But the parties disagree regarding which written agreement determines the entity that should be financially

10

responsible for the relocation costs.  The City argues it is section 8(a) of the Franchise Agreements.  SDG&E claims the Manual governs the dispute.

The parties made similar arguments below.  At the same time, however, they appeared to agree that the trial court needed to answer the primary question:  Whether the City's proposed water projects were governmental or proprietary in nature.  As noted *ante*, if they were governmental, SDG&E was to pay location costs.  If proprietary, the City was responsible for the bill.

The trial court was persuaded by the parties' apparent agreement and analyzed whether the water projects were governmental or proprietary.  Finding them proprietary, the court granted SDG&E's motion for summary judgment.  The City maintains that we should not adopt "the erroneous framework the trial court adopted, at SDG&E's urging."  However, the record belies the City's assertion that the governmental-proprietary framework was solely argued by SDG&E.  To the contrary, the record makes clear that the City repeatedly, if not somewhat inconsistently, told the trial court to analyze the case through that same lens.

For example, in its motion for summary judgment, after arguing that the Franchise Agreements were the operative contracts, the City asserted the following:

> "The only legal issue in dispute on the City's declaratory relief cause of action is whether the City or SDG&E is responsible for payment of relocation costs for SDG&E infrastructure. This distinction of whether the municipal water program, and by extension the Pure Water Program, is proprietary or governmental in nature, will determine which party is financially responsible for the costs. *Therefore, the Court must decide this legal issue in order to determine whether SDG&E* breached the Franchise Agreements."  (Emphasis added.)

11

Further, the City later reiterated what it believed to be the essential issue for the superior court: "The primary issue for this court is to determine whether the City's water service is a governmental function such that SDG&E is obligated to pay for relocation costs due to underground alignment conflicts with City water projects." And the City then spent several pages of its motion explaining why the water projects should be considered governmental in nature.

In opposing SDG&E's motion for summary judgment, the City began by framing the primary issue for the court: "At issue in SDG&E's instant motion is the singular question of whether the City's water service to its citizens is governmental or proprietary[?]" The City then dedicates the next several pages of its opposition explaining why the water projects are governmental.

Moreover, at the beginning of oral argument on the motions for summary judgment, the City's attorney focused the court on the critical issue of the dispute: "This case is really about whether the City is acting as a market participant in its provision of water to its residents." In other words,

it asserted the governmental-proprietary distinction needed to be resolved to decide the cross-motions for summary judgment.[3]

On appeal, however, the City's theory seems to have changed, or at the very least, become more refined. The City still claims that the Franchise Agreements are the governing documents and not the Manual. Yet, the City now insists there is no need to determine whether the proposed water projects are governmental or proprietary. In other words, if the Franchise Agreements are the operative contracts, the City wins without further analysis. Therefore, the City begins the argument portion of its opening brief as follows:

> "For over 50 years, SDG&E has had the privilege of operating under an exclusive franchise to use the City's public rights-of-way for its electric and gas utilities. For over 50 years, the City and SDG&E have each accepted their respective rights and obligations under the terms of their Franchise Agreements. Among those terms is the condition that if any of its infrastructure conflicts with the City's reserved rights to control its public rights-of-way, SDG&E would relocate those facilities 'without cost or expense to [the] City.' [Citations.] SDG&E also agreed that if there was ever any doubt about the interpretation of such terms in the Franchise Agreements, they would 'ever be

---

[3]    We note that toward the end of oral argument on the motions for summary judgment, one of the City's attorneys, in discussing whether one of the water projects should be considered a sewer project, made the following argument to the court: "If your Honor decides that section 8(a) of the Franchise Agreement is governing and the [Manual] did not amend the Franchise Agreement because it can't under Charter section 103, then 8(a) is binding and it doesn't matter if [the project] is water or sewer." In this statement, the City appears to be unequivocally arguing that the Franchise Agreements require SDG&E to pay relocation costs without consideration of the governmental-proprietary distinction. Nonetheless, this single sentence is at odds with much of the rest of the City's argument at the summary judgment hearing.

strictly construed against the Grantee'—i.e., against SDG&E. [Citations.]"

Thus, the City makes it explicitly clear on appeal that "[t]he intent of the Franchise Agreements is unambiguous. SDG&E agreed to bear the costs of relocation 'without cost or expense to [the] City,' no matter the purpose, financial source, or scope of the project."

SDG&E points out that the City is offering a new theory on appeal and ignoring the fact that the City agreed below that the critical issue to be determined by the trial court was whether the water projects were governmental or proprietary in nature. We too are puzzled by the City's apparent change in its approach regarding what is required to determine whether SDG&E breached the Franchise Agreements. This argument does not appear to have been unambiguously made below. Accordingly, we understand why the superior court concluded that the parties agreed to the governmental verses proprietary test.

Typically, " '[a] party is not permitted to change [its] position and adopt a new and different theory on appeal. To permit [it] to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1350, fn. 12.) Despite this general rule, courts have discretion to consider a new theory on appeal if it involves a legal question based on undisputed facts. (See *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1459.)

Here, the City appears to be advancing a new legal argument that does not require the marshalling of any additional facts. Indeed, the City is asserting that, if the Franchise Agreements govern the dispute here, they require SDG&E to pay for the relocation costs regardless of whether the water projects are governmental or proprietary in nature. In this sense, the City's new theory is one of interpretation, and contract interpretation, in

14

general, presents a legal issue unless interpretation turns on resolving conflicts in competent and relevant extrinsic evidence. (See *Penn-America Ins. Co. v. Mike's Tailoring* (2005) 125 Cal.App.4th 884, 889.)

Yet, the City's theory on appeal is not a modest change to its argument below. Rather, it is a significant departure that tells this court we do not even need to consider the very issue the City and SDG&E represented to the trial court was critical to the resolution of their dispute. Further, it strikes us as curious that, considering their lengthy contractual relationship, the City would offer an interpretation consistent with SDG&E's interpretation in the superior court, lose the motion for summary judgment, and then offer a new theory of interpretation on appeal and argue that the trial court erred based on this new theory.

Nonetheless, we shall exercise our discretion and consider the City's new argument here. We think this the prudent course for multiple reasons. First, the parties asked us to resolve the issue of which agreement governs the dispute. In fact, they have represented that their newly negotiated franchise agreements contain a clause indicating that the parties will abide by the courts' final determination of this matter. Further, deciding this matter on forfeiture grounds without determining which agreement governs would provide little guidance for the parties under their new franchise agreements. And during oral argument here, SDG&E conceded that forfeiture would not be a valid argument under existing precedent. Second, we see no prejudice to SDG&E in proceeding on the merits and addressing the City's new theory. SDG&E had the opportunity to address this theory and did so. Moreover, SDG&E does not claim it needs additional evidence to address the City's argument on appeal. Third, the resolution of this matter will have profound fiscal and qualitative effects on the residents of San Diego

15

County. Finally, we acknowledge that the City, below, argued that the Franchise Agreements were the operative contracts, and if we gaze deep enough, we can see where the City was fashioning an argument that could be construed, despite language to the contrary in the same motion, that SDG&E was required to pay for relocation costs under section 8(a) of the Franchise Agreements regardless of whether the water projects were governmental or proprietary in nature.

This leaves the threshold question to be decided on appeal as what governs the instant dispute—the Franchise Agreements or the Manual?

C.      *Which Agreement Governs*

The parties agree that the Franchise Agreements and the Manual are contracts. As such, the "fundamental goal" in interpreting these written agreements "is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract." (*Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 916.) The parties' mutual intention is determined by objective manifestations of such intent: where "the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement." (*Ibid.*; see Civ. Code § 1638; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.)

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) The contract must be construed as a whole; detached words or clauses standing alone are not controlling on the question of interpretations. Each must be viewed in relation to the agreement as an entity; "and, if this is impossible, [we] favor an 'interpretation which gives effect to the main apparent purpose of the contract.' " (*Harris v. Klure* (1962) 205 Cal.App.2d 574, 578.) A contract must be interpreted to avoid absurd

16

results and to make the contract lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties. (Civ. Code, § 1643; *Pacific Tel. & Tel. Co. v. City of Lodi* (1943) 58 Cal.App.2d 888, 892.) "The words of a contract are to be understood in their ordinary and popular sense." (Civ. Code, § 1644.)

As discussed *ante*, the Franchise Agreements consisted of two separate agreements—one granting SDG&E a franchise to provide electricity and the other permitting SDG&E to supply natural gas. Yet, each franchise agreement included substantially similar language for sections 7 and 8. Additionally, by way of two separate ordinances, the City approved the Franchise Agreements on December 17, 1970, and SDG&E entered into those Franchise Agreements a month later.

Section 8 was entitled "CITY RESERVED POWERS" and consisted of two subsections. The first (subsection (a)) stated in part that the "City reserves the right for itself to lay, construct, erect, install, use, operate, repair, replace, remove, relocate, regrade or maintain below surface or above surface improvements of any type or description in, upon, along, across, under or over the streets of the City." Section 8(a) further provided that "[i]f the necessary exercise of the aforementioned reserve rights conflicts with any poles, wires, conduits, and appurtenances of [SDG&E] constructed, maintained and used pursuant to the provisions of the franchise granted hereby, whether previously constructed, maintained and used or not, [SDG&E] shall, without cost or expense to [the] City within ninety (90) days after written notice from the City Manager, or his designated representative, and request so to do, begin the physical field construction of changing the location of all facilities or equipment so conflicting."

17

Section 8(b) provided that, "[i]rrespective of any other provision of this ordinance, [SDG&E's] right to construct, maintain and use, or remove poles, wires, conduits, and appurtenances thereto shall be subject at all times to the right of the City, in the exercise of its police power, to require the removal or relocation, to either overhead or underground locations, of said poles, wires, conduits, and appurtenances thereto at the sole costs and expense of [SDG&E]."

However, the Franchise Agreements included section 7 (ADMINISTRATIVE PRACTICES), which also could address the relocation of SDG&E's facilities and equipment. That section charged SDG&E "with the responsibility of cooperating with City in preparing a manual of administrative practices[,] which shall govern the installation and removal of [SDG&E's] facilities in the streets of [the] City[.]" In addition, the City and SDG&E were required to "review and update such administrative practices" "once each year." Section 7 concluded by explaining: "Following the preparation of said manual, and its approval by the City Council, it shall govern the practices of [SDG&E] in its installation and removal of [SDG&E's] facilities in the streets of [the] City."

Per section 7 of the Franchise Agreements, the City and SDG&E negotiated the Manual a year after entering into the Franchise Agreements. An amended manual was adopted on February 24, 1986. That is the Manual at issue here.

The Manual is entitled "MANUAL OF ADMINISTRATIVE PRACTICES FOR UTILITY INSTALLATIONS IN PUBLIC RIGHTS-OF-WAY 1985." In the introduction, the Manual explains that "[t]he need for a manual . . . was identified during the negotiations[,] which preceded the City Council's franchise grant to the San Diego Gas & Electric Company in 1970."

18

Also, the Manual sets forth that the "1985 manual represents an up-dating to reflect experience gained in the last thirteen years."  The Manual, however, does not only address the City's relationship with SDG&E.  Rather, the Manual covers 10 other utilities, some that are under franchise agreements with the City and others that are not.

As relevant here, the Manual includes section VII, entitled "Relocation of Utilities."  That section begins with the following prefatory statement:

> "All utilities maintaining installations in the public rights-of-way are required to relocate these utilities whenever such relocation is necessary to accommodate public improvements required by the City, subject to franchise conditions and Public Utility Commission rules governing such matters."

Section VII then continues to explain how the costs of relocation shall be allocated:

> "In general, the expense of relocation shall be borne as follows:
>
> "1.  By the City:  Where utility facilities rights are prior in time or prior in right to those of the City, or where public rights-of-way have been acquired by annexations, they are considered to be owed by the annexing agency from the time they were originally acquired by the agency from whom they were annexed.
>
> "2.  By the Utility:  Where City facilities and improvements are financed by the City (assessment districts, gas tax, federal or state funds or grants, capital outlay funds or from any other source where The City finances the contract work, either private or public), and where such facilities or

improvements are governmental in nature as opposed to proprietary in nature."[4]

On the one hand, the Manual, which is explicitly required by section 7 of the Franchise Agreements, allocates relocation expenses between the City and utility company depending on the circumstance. On the other hand, section 8(a) of the Franchise Agreements required SDG&E to bear the cost of relocation for any improvements by the City "upon, along, across, under or over the streets," provided that the City gave SDG&E written notice of the need to relocate. Further, section 8(b) also required SDG&E to pay to relocate when the cause of relocation is the City's exercise of its police powers. Thus, regarding the allocation of relocation costs, the Manual and the Franchise Agreements seem to be at loggerheads. How then are we to interpret these agreements, together, giving effect to the mutual intentions of the parties at the time they executed them? (See *Gilkyson v. Disney Enterprises, Inc.*, *supra*, 66 Cal.App.5th on p. 916.)

Here, the City maintains that the Manual does not apply to SDG&E, at least as far as section VII is concerned. The City emphasizes that the "clear, explicit, and straightforward" terms of the Franchise Agreements unmistakenly establish that "SDG&E may use the City's streets for its facilities, but in the event of a future City project requiring SDG&E to relocate or reconfigure its facilities, SDG&E alone would bear the costs for such relocation."

The City further asserts that the Manual is "fully consistent with the Franchise Agreements' mandate that SDG&E bear its relocation costs in the

---

4     The Manual also allocates the cost of relocation to developers under certain conditions. Because that provision is not pertinent here, we do not discuss it further.

20

case of a conflict with the City's project here." Thus, the City contends that the Manual's "Relocation of Utilities" policy as set forth in section VII is subject to "franchise conditions and Public Utility Commission rules governing such matters." Accordingly, the " 'general' " relocation cost provision is subordinate to the Franchise Agreements (specifically section 8). Moreover, the City explains that its interpretation that the Manual is subordinate to the Franchise Agreements "makes sense in light of the circumstances under which the [M]anual came to be." Consequently, the City explains that the Manual "was a collaborative effort among numerous entities, which was intended to govern the various utilities operating in the City." Thus, the City insists that by making the Manual's relocation policy " 'subject to franchise conditions,' the drafters of the [M]anual ensured that the general administrative rules contained therein would not interfere with any independent, negotiated franchise agreements like the ones at issue here."

So, we summarize the City's position as follows: The City and SDG&E entered into the Franchise Agreements in 1971. Section 8(a) of those agreements required SDG&E to relocate its facilities and equipment, at no cost to the City, within 90 days of receiving written notice, if relocation was required by the City embarking on "improvements of any type." The Manual's primary purpose is coordinating and standardizing the installation of utility equipment among the numerous utilities that share use of the City's streets. The Manual contains a section regarding the allocation of relocation costs, but that section is written in general terms and does not apply to any utility company that has its own franchise agreement with the City and where that franchise agreement specifically addresses the cost of relocation. Accordingly, the City maintains the Franchise Agreements govern the

21

allocation of relocation costs with SDG&E and under section 8(a), SDG&E is financially responsible for those costs regardless of the type of project. The Manual's relocation provision simply does not apply to SDG&E.

SDG&E contends the City's interpretation is wrong. To this point, it argues the City and SDG&E agreed in the Franchise Agreements, under section 7, to negotiate and execute the Manual. The Manual, which was signed some 15 years after the parties executed the Franchise Agreements, was meant to govern issues involving the installation and relocation of SDG&E's facilities, including which entity pays for utility relocations. And SDG&E sees no conflict between the Manual's relocation costs allocation provision and section 8(a) of the Franchise Agreements. SDG&E underscores its position by insisting that "the Franchise Agreements specifically contemplated that the provisions of the Manual would govern."

Additionally, SDG&E argues that "[t]he chronology of the City's and SDG&E's contractual agreements confirms the parties' historical expectation that the Manual's cost-allocation rule would govern the outcome of these cases." SDG&E explains that before the Franchise Agreements were negotiated, the City and SDG&E identified the need for more detailed administrative practices that would govern the installation and removal of SDG&E's facilities, the level of detail of which would be "out of place" in the Franchise Agreement. Therefore, shortly after executing the Franchise Agreements, the parties, following section 7 of those agreements, negotiated a first manual. Some 15 years later, they updated that manual with the Manual that is at issue here. SDG&E represents the need for the update was that more utilities were operating in the City's streets. Thus, these utilities were to "adher[e] to the policies and the procedures outlined" in the Manual. SDG&E offers that the use of the Manual also provides a level of convenience

22

because the City did not have to continually negotiate, modify, and execute existing franchise agreements with each utility whenever the need to adjust any practice or procedure arose. And in adopting the governmental-proprietary distinction, the Manual was consistent with the common law at that time.

So, to summarize SDG&E's theory, the parties understood the need to negotiate a manual before entering into the Franchise Agreements. To this end, they included that requirement in section 7 in the Franchise Agreements. Once prepared and agreed to, the manual was to "govern the installation and removal of [SDG&E]'s facilities in the streets of [the] City." The original manual was revised in 1985 and agreed to in 1986, which is the Manual we are concerned with here. The Manual specifically addresses the allocation of relocation costs that SDG&E urges us to apply in the instant matter.

However, SDG&E's interpretation of the Franchise Agreements and the Manual gives us pause. We are concerned with SDG&E's lack of a persuasive explanation regarding the purpose of section 8(a) of the Franchise Agreements if we apply section VII.1 of the Manual to decide which party must pay the relocation costs here. SDG&E characterizes section 8(a) as "a fallback (or default) provision." It further argues the City simply "reserve[d] the right" to require SDG&E to relocate at its expense, but that right did not withstand the parties "agreement in Section 7 to further negotiate that very topic." We struggle to read section 8(a) in the manner SDG&E suggests.

Section 8(a) is clear. Through that provision, the City "reserve[d] the right" to make "improvements of any type or description in, upon, along, across, under, or over the streets of the City." If those improvements

23

"conflict[ ] with" SDG&E's "poles, wires, conduits, and appurtenances" then SDG&E must, "without cost or expense to [the] City," relocate the conflicting "facilities" and "equipment" within 90 days of receiving written notice. We read nothing in section 8(a) that even hints at it being a "fallback" or "default" position. Rather, the terms are plain and straightforward. If the City makes an improvement on or below its streets, and that improvement conflicts with SDG&E's facilities and/or equipment, SDG&E must not only move its facilities and/or equipment but also bear the cost of that move.[5] In this sense, section 8(a) is not only unambiguous; it is broad and absolute. If a relocation is necessary, SDG&E pays for it.

That said, we acknowledge that simply because the City reserved certain rights in section 8(a) does not prohibit the City from later negotiating away those rights and carving out a portion of those rights. Nonetheless, the Manual is not the talisman SDG&E seeks in this regard.

When the City and SDG&E negotiated the Manual, they had already been operating under the Franchise Agreements for over 14 years. Certainly, they were both aware of the terms of the Franchise Agreements, specifically section 8(a). Moreover, as we discussed *ante*, section 8(a) explicitly stated that SDG&E was responsible for all relocation costs. With that knowledge, we would expect that, if the Manual was intended to supersede section 8(a), it would unmistakably say so. Yet, we read no such language in the Manual. Section VII of the Manual is entitled "Relocation of Utilities." It explicitly states that it is subject to "franchise conditions." Those conditions, as they would apply to SDG&E, would be found in the Franchise Agreements. The Franchise Agreements address relocation of utilities in sections 7 (requiring

---

5 The clarity of section 8(a) makes the City's arguments below even more bewildering.

the negotiation of the Manual) and 8 (requiring SDG&E to pay all relocation costs).  In applying the Franchise Agreements in this manner, section 7 is somewhat tautological.  It states the parties shall negotiate a manual of administrative practices that will "govern the installation and removal of [SDG&E's] facilities in the streets of [the] City."  The Manual, however, states, concerning relocation of utilities, it is subject to "franchise conditions" (i.e., the Franchise Agreements here).  In contrast, there is nothing circular about the application of section 8(a), which requires SDG&E to pay for any relocation costs.

SDG&E finds fault with this interpretation of the phrase "subject to franchise conditions," arguing that reading it in a manner that would impact the allocation of relocation costs would violate the last antecedent rule. (See *Yahoo Inc. v. Nat. Union Fire Ins. Co. etc.* (2022) 14 Cal.5th 58, 73 [" ' " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding [them] and are not to be construed as extending to or including other[ ] [words or phrases] more remote' " ' "].) Therefore, SDG&E notes that the phrase "subject to franchise conditions" only appears in the sentence preceding the discussion of the allocation of relocation costs.  Because the subject phrase does not modify or otherwise appear in the sentence describing relocation costs, SDG&E claims its improper to consider the Franchise Agreements regarding the payment of relocation costs.  We are not persuaded.

First, the Manual directly states that utilities "maintaining installations in the public-rights-of-way are required to relocate these utilities whenever relocation is necessary to accommodate public improvements required by the City, subject to franchise conditions . . . governing such matters."  In other words, if a utility's facilities

and/or equipment conflicts with a City improvement, under the Manual, the utility must relocate, subject to what the franchise agreement with that specific utility may state (to the extent one exists). Here, that language leads us to sections 7 and 8 of the Franchise Agreements. We read nothing in the Manual that tells us to ignore section 8(a).

Second, the Manual begins its explanation of the allocation of relocation costs with the following clause: "In general, the expense of relocation shall be borne as follows[.]" That clause indicates that the Manual's *general* rule would apply to all utility companies in the absence of a more specific agreement with a particular utility company. Where general and specific provisions are inconsistent, the specific provision controls. (Code Civ. Proc., § 1859; *Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1235.) Here, section VII of the Manual and section 8(a) of the Franchise Agreements are inconsistent. Section VII states it applies generally to the multiple utilities who have signed the Manual. Section 8(a) only applies to SDG&E and is very clear: SDG&E must pay for any relocation. Therefore, section 8(a) should control.

In contrast to SDG&E's attempt to explain the purpose of section 8(a), we are persuaded by the City's explanation of section VII of the Manual if we apply section 8(a) here. We agree that the allocation of relocation costs set forth in the Manual does not apply to SDG&E because of the existence of section 8(a) in the Franchise Agreements. However, this interpretation does not render section VII superfluous. As the parties agree, the Manual not only applies to SDG&E but to 10 other utilities. Thus, even if we determine that the allocation of relocation costs found in section VII does not pertain to

26

SDG&E, it would nevertheless govern the other utilities, subject to any specific, applicable franchise agreements.[6]

Further, our conclusion here is a limited one. The Manual contains 11 separate provisions. These provisions are varied and cover a variety of topics (e.g., a utilities coordination committee, pavement cutting, pavement restoration, safety and traffic control, and emergency repairs). We are simply deciding here that section VII of the Manual does not apply to SDG&E regarding the allocation of relocation costs to the extent it is inconsistent with section 8(a).

Finally, the Franchise Agreements explained the importance of all the provisions contained therein:

> "This franchise is granted upon each and every condition herein contained and shall ever be strictly construed against [SDG&E]. Nothing shall pass by the franchise granted hereby to [SDG&E] unless it be granted in plain and unambiguous terms. Each of the conditions is a material and essential condition to the granting of the franchise."

Based on the plain language of the Franchise Agreements, we read no justification to ignore section 8(a).

In short, section 8(a) governs the dispute here and is not displaced by the Manual regarding the allocation of relocation costs. Under section 8(a), SDG&E agreed to relocate its facilities and equipment if required to accommodate a City improvement impacting the City's streets. Moreover, it agreed to such relocation at no cost to the City. Accordingly, the trial court

---

[6] Therefore, unlike the superior court, we are unconcerned that finding section VII inapplicable to SDG&E would somehow impact the other utilities operating under the Manual.

27

erred in granting SDG&E's motion for summary judgment and denying the City's motion for summary judgment.[7]

DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with instructions to enter summary judgment in favor of the City and proceed accordingly. The City is entitled to its costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

DATO, J.

KELETY, J.

---

[7] Because we conclude that section 8(a) of the Franchise Agreements governs the instant dispute and that provision requires SDG&E to pay for all relocation costs, we do not reach the issue of whether the water projects are governmental or proprietary in nature.

28